Robert F. CHRISTIAN, II, Plaintiff,

v.

The **UNITED STATES**, Defendant.

No. 97–165C.

United States Court of Federal Claims.

June 5, 2000.

John K. Larkins, Jr., Law Offices of Chilivis, Cochran, Larkins & Bever, LLP, Atlanta, GA, for plaintiff. Nickolas P. Chilivis and J.D. Dalbey, Law Offices of Chilivis, Cochran, Larkins & Bever, LLP, Atlanta, GA, of counsel.

Lt. Col. Billy Nix, U.S. Army (Ret.), Newnan, GA, pro se applicant for intervention as plaintiff.

Armando O. Bonilla, with whom were James M. Kinsella, Assistant Director, David M. Cohen, Director, Commercial Litigaton Branch, and Frank W. Hunger, Assistant Attorney General, Civil Division, U.S. Department of Justice, Washington, D.C., for defendant. Lt. Col. Terry L. Elling, Chief, Military Personnel Litigation, and Cpt. Joanne P. Tetreault, Army Legal Services Agency, U.S. Department of the Army, Arlington, VA, of counsel.

## *OPINION*

SMITH, Chief Judge.

This case, and the constitutional claim raised in this case, is not about race. However, it involves deeply held concerns about creating a society free of the scourge of racial injustice that has, during much of our history, diminished the quality of life for African–Americans as well as other racial, ethnic, or religious minorities. Today, the court is called to examine whether a modern affirmative action program of the United States Army upholds the promise of justice for individuals of all races. This promise is, forever enshrined in the law of the land by the tears and triumphs of the great civil rights struggles of the past century and a half.

How, then, should this court determine whether the program at issue is fundamentally just and consistent with our Constitution? In 1963, Dr. Martin Luther King, Jr. gave the following answer:

> An unjust law is a human law that is not rooted in eternal law and natural law. Any law that uplifts the human personality is just. Any law that degrades human personality is unjust. All segregation statutes are unjust because segregation distorts the soul and damages the personality. It gives the segregator a false sense of superiority and the segregated a false sense of inferiority, ... and ends up relegating persons to the status of things. Martin Luther King, Jr., *Letter from Birmingham Jail*, *in* I Have a Dream: Writings and Speeches that Changed the World 83, 89 (James M. Washington ed., Harper Collins 1992).

Racial prejudice is ugly and foul. It not only harms those whom it is directed towards, but it also destroys the souls of those in whose hearts it resides. The military's efforts to eradicate it are praiseworthy in the

best sense. Just as our Armed Forces, of all races, have ensured our freedom with the blood of thousands and thousands of our best and brightest, they are now attempting to ensure a military that is focused on merit, but blind to color. That task, however, cannot be achieved by unjust and unconstitutional means, no matter how worthy its goal. Dr. King himself repeatedly observed that the moral cause of racial justice cannot be fought by immoral means, and that freedoms of whites and blacks are "inextricably bound" to one another. *See, e.g.,* King, Jr., *I Have a Dream, in* I Have a Dream: Writings and Speeches that Changed the World 101, 103 (James M. Washington ed., Harper Collins 1992). Race is a constitutionally suspect classification. Government cannot hire, fire, promote, retire, reward, award, evaluate, or choose on the basis of race. There is no such thing as "separate but equal."

Procedurally, the case is before the court on defendant's Motion to Dismiss and for Judgment upon the Administrative Record, plaintiff's Cross–Motion for Judgment upon the Administrative Record, and plaintiff's Motion for Class Certification. Plaintiff, U.S. Army Lt. Colonel Robert F. Christian, II, claims that he was illegally retired from the Army because the statutes and procedures governing his selective early retirement were violated and because the Army's race and gender-based retention goals and retirement selection procedure violated the equal protection component of the Due Process Clause of the Fifth Amendment. During the course of this litigation, another former Army Lt. Colonel, Billy Nix, filed a Motion to Intervene as plaintiff, pressing substantially the same claims.

For the reasons stated below this court GRANTS Defendant's Motion to Dismiss in part, GRANTS plaintiff's Cross–Motion For Judgment Upon the Administrative Record in part, and GRANTS plaintiff's Motion for Class Certification in part. Additionally, the Court DENIES the Motion to Intervene, but INCLUDES Lt. Col. Nix as a member of the class.

## FACTS

In 1980, Congress enacted the Defense Officer Personnel Management Act (DOP-

MA). Pub.L. No. 96–513, 94 Stat. 2835 (Dec. 12, 1980). Under DOPMA, Regular Army Lieutenant Colonels (LTCs) twice considered but not selected for promotion to Colonel and not placed on another promotion recommendation list may be considered for mandatory early retirement by a Selective Early Retirement Board (SERB). 10 U.S.C. § 638(a)(1) (1997). DOPMA requires that the Secretary of the Army submit a list of officers to the selection board which includes all mandatory retirement-eligible LTCs between the most junior and the most senior LTC to be considered. 10 U.S.C. § 638(e)(2)(A) (1997). The Secretary must specify the number of eligible LTCs which a SERB may recommend for early retirement. Such number may not be more than thirty percent of the number of officers considered in each grade in each competitive category. 10 U.S.C. § 638(a)(2) (1997).

On January 13, 1992, the Secretary of the Army issued a Memorandum of Instruction (MOI) to the SERB contained selection goals and requirements for different LTC career fields and skills. The MOI's substantive selection policies were set forth in Enclosure 1, Guidance, while the MOI deliberation process was set forth in Enclosure 2, Administrative Instructions, ¶ 3, Concept of Operations. The parties stipulated that the SERB followed the MOI. In addition to the description immediately below, the court will also discuss appropriate details along with its deliberations on the various counts.

The Concept of Operations established four phases for the SERB's internal decision making. At Phase I, the SERB evaluates the records of all officers in accordance with the standards specified in the Guidance (hereinafter Phase I evaluation), assigns a numeric score to each record, and establishes an order of merit list regardless of the career field or skill. As fully discussed below, the Guidance announced a goal for the percentage of minorities and women to be retired and provided different evaluation standards for minorities and women than for officers in general, ostensibly due to possible past personal or institutional discrimination.

At Phase II, the SERB selects from the order of merit the quantity of officers necessary to meet the MOI's optimum number of retirees. The SERB then engages in a statistical comparison of minority and female selections with selections of other officers. Phase II also created selection goals for minority and female officers which called for the SERB to achieve a percent of minority and female officers recommended for retirement not greater than the rate for all officers in the zone of consideration. In evaluating minority and female officers, the SERB was again instructed to take into account past personal and institutional discrimination, as defined in the Guidance, which may have disadvantaged the officer. If the comparisons are unfavorable, either overall or in a certain field, the SERB reevaluates the records of minority and female officers in accordance with the same MOI Guidance standards (hereinafter Phase II reevaluation) and may revote on merit scores assigned to the records (hereinafter Phase II revote) so as to change their place on the list. The SERB then prepares the tentative retirement selection list.

During the last two phases, the SERB engages in adjustments related to career fields and skills. Phase III involves preparation of separate orders of merit for each career field or skill specified in an annex to the MOI and selection of officers who are not fully qualified or fitting to meet the needs of the Army in those areas. Finally, during Phase IV, the SERB is supposed to conduct a final vote on the list of officers to be retired while ensuring that the Secretarial career field and skill requirements are met. If these requirements were not met during prior steps but the overall optimum number was met, the SERB was to reduce the number of LTCs to be recommended for retirement. The list was to be reduced to a number equal to or greater than the minimum number the SERB could recommend for retirement. If the overall number to retire was already at the minimum level, then the board was to replace LTCs in undesired career fields who were not initially selected for early retirement with LTCs in desired career fields or skills who were initially selected for early

retirement. The replacement was to proceed in reverse order of merit.

The MOI Guidance listed a number of factors for evaluation of officer records, to wit: military bearing and physical fitness, military and civilian education and professional training, assignment history and professional development, record of performance, including character, communication skills, and teaching abilities, derogatory information, weight control, medical profiles, the Officer Evaluation Reports (OERs), career development, and marital status. The Guidance, just like Phase II Concept of Operations, also created selection goals for minority and female officers which called for the SERB to achieve a percent of minority and female officers recommended for retirement not greater than the rate for all officers in the zone of consideration. In evaluating minority and female officers, the SERB was instructed to take into account past personal and institutional discrimination, as defined by the Secretary, which may have disadvantaged the officer. The Guidance defined potential indicia of discrimination to include "disproportionately lower evaluation reports, assignments of lesser importance or responsibility, and lack of opportunity to attend career-building military schools," in effect, setting forth a special standard for evaluation of one's service record. Administrative Record at 189 (hereinafter AR). By its terms, this standard applied both at Phase I and Phase II evaluations. SERB was required to report any failures to meet the goal and explain the situation. The 1992 After–Action Report indicates the revote procedure was used, and that some minority officers were selected for retention following the revote. See AR at 123. Women, however, benefitted only from a special Phase I evaluation, because their selection during Phase I comported with the proportionality goals.

The SERB convened January 14, 1992 pursuant to the MOI from the Secretary and recessed on February 6, 1992, recommending the retirement of 1169 LTCs. The Secretary of the Army approved the SERB's recommendations on February 29, 1992, and the plaintiff and others selected for retirement were required to retire no later than August

31, 1992. Eight months after the SERB recessed, Congress enacted a law that amended DOPMA at 10 U.S.C. § 638a. Pub.L. No. 102–484. The newly inserted paragraph, effective October 23, 1992, gives the Secretary the option of submitting all the names of eligible LTCs in a competitive category or submitting the names of LTCs in a competitive category who are also in particular year groups, specialties, etc., as was already the case for lower grade officers. 10 U.S.C. § 638a(c)(3). The sections' language in effect at the time of the 1992 LTC ACC SERB's deliberations was silent on submissions by criteria within a competitive category, but not expressly prohibitive of such submissions.

Plaintiff applied to the Army Board for Correction of Military Records (ABCMR) for administrative remedy on March 25, 1993. The plaintiff submitted additional comments to his application to the ABCMR on May 31, 1995. On April 10, 1996, the ABCMR denied his request for a hearing and denied all relief requested. On March 14, 1997, plaintiff filed a Complaint in this court and a Motion for Class Certification. On July 14, the defendant filed a Motion to Dismiss and for Judgment upon the Administrative Record. Plaintiff responded with a Cross Motion for Judgment upon the Administrative Record on August 11, 1997. The court heard initial oral argument on October 21, 1997.

On November 4, 1997, plaintiff filed a Motion for Leave to Amend his Complaint, and on May 15, 1998, plaintiff filed a Motion for Leave to Amend his Motion for Class Certification. The new filings related to the Fifth Amendment Due Process claim. The court granted plaintiff's Motion for Leave to Amend his Complaint and Motion for Leave to Amend his Motion for Class Certification on June 12, 1998. Defendant renewed its Motion to Dismiss and for Judgment upon the Administrative Record on September 15, 1998.

Separately, on September 15, 1998, retired Lt. Colonel Billy Nix of the U.S. Army Aviation Corps applied with this court *pro se* to intervene as plaintiff, either as a matter of right or by permission. Applicant Nix was retired by the same SERB as plaintiff, and the Motion to Intervene alleged interests directly related to those of Lt. Col. Christian.

Plaintiff renewed his Cross–Motion on December 3, 1998. The court heard a new oral argument on the Amended Motions and defendant's renewed Motion to Dismiss on April 1, 1999.

## DISCUSSION

Plaintiff's complaint, as amended, contains four counts. The first and second counts allege that the Secretary's MOI and the SERB's compliance therewith violated 10 U.S.C. § 638 and 638a, and Department of Defense Directive (DoDD) 1332.32 and, thus, were illegal and void. The third count alleges that by denying the relief requested in plaintiff's application for administrative remedy, the ABCMR violated 10 U.S.C. § 1552. The fourth count alleges that the Army's race and gender-based goals and revote procedure violated the Due Process Clause of the Fifth Amendment. Plaintiff prays for monetary and other relief.

## I. JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction to entertain all claims presented by plaintiff pursuant to the Tucker Act, 28 U.S.C.A. § 1491(a)(1) (claims for money judgment) and (2) (relief "incident of and collateral to" a monetary judgment) (1997). The money mandating statutes which support the Tucker Act jurisdiction are the Military Pay Act, 37 U.S.C. § 204, and 10 U.S.C. § 1552 (1997). If plaintiff's retirement was "involuntary and improper" under the Constitution or the governing statutes and directives, he retains his right to active duty pay under section 204. *See West v. United States*, 35 Fed.Cl. 226, 230 (1996). Section 1552, which deals with correction of military records by Armed Services boards, is itself money mandating. *See French v. United States*, 42 Fed.Cl. 49, 53 (1998).

In light of the government's introduction of matters outside the pleadings, the Court will treat its Motion to Dismiss under RCFC 12(b)(4) as an RCFC 56 Motion for Summary Judgment. *See* RCFC 12(b). The same standard applies for the parties' Cross–Mo-

tions for Judgment upon the Administrative Record. *See Wells v. United States,* 46 Fed. Cl. 178, 180–181 (2000); *Weaver v. United States,* 46 Fed.Cl. 69, 76 (2000). Summary judgment may be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c). However, "[d]isputes over facts which are not outcome-determinative under the governing law will not preclude the entry of summary judgment." *Wells,* 46 Fed.Cl. at 180–181. Because the parties cross-moved under RCFC 56.1, "each party bears its own burden to demonstrate the lack of genuine issues of material fact [and] the court infers all evidence in light most favorable to the nonmovant." *Weaver,* 46 Fed.Cl. at 75 (citations omitted). However, plaintiff must show by "cogent and clearly convincing evidence" that the ABCMR's decision was arbitrary, illegal, or in bad faith, and that he suffered substantial prejudice as a result. *French,* 42 Fed.Cl. at 56.

## II. GOVERNING STATUTES AND PROCEDURES

In his first two counts, plaintiff claims that the 1992 MOI and the actions of the SERB in accordance therewith violated the statutes and procedures governing selective early retirement, 10 U.S.C. § 638, Selective Early Retirement, and 638a, Modification to Rules for Continuation on Active Duty; Enhanced Authority for Selective Early Retirement and Discharges, as well as DoDD 1332.32, Selective Early Retirement of Regular Commissioned Officers on Active Duty.

■ The controlling statute, 10 U.S.C. § 638, does not expressly prohibit the Secretary of the Army from dividing up the eligible LTCs into career fields or skills and requiring or recommending retention of a certain number of LTCs in these fields. The government argues that the authority is discretionary and necessary to maintain the objectives of the Army in this era, and this court agrees. There is little less suited for judicial decision-making than the decision over which skill mix will enhance our Nation's defense. In a similar situation involving an Air Force regulation, this court found that "in the absence of a statute prohibiting the Air Force from implementing the regulation in the manner described, the court is without authority to interject itself in this dispute." *Small v. United States,* 37 Fed. Cl. 149, 153 (1997), *aff'd* 158 F.3d 576 (Fed. Cir.1998); *see also Murphy v. United States,* 993 F.2d 871 (Fed.Cir.1993)(review of military personnel decisions is only appropriate where discretion of Secretary of Defense is limited, and Congress has established tests and standards against which a court can measure the Secretary's conduct).

The governing statute states that the Secretary "shall specify the number of officers ... [a SERB] may recommend for early retirement ... [and] that number shall not be more than 30 percent of the number of officers considered in each grade in each competitive category." 10 U.S.C. § 638(a)(2) (1997); *accord* 10 U.S.C. § 638a (c)(1) (retaining the same requirement for temporary modifications of section 638 regarding LTCs). "Grade" means officer rank, in this case LTC, and both parties agree that "competitive category" means non-line versus line officers. *See* 10 U.S.C. § 621; DoDD 1332.32(C)(3); *Small,* 37 Fed.Cl. at 154 n. 4, 156. Thus, the Secretary could not specify a number that the SERB could recommend for retirement that was more than 30 percent of the line LTCs eligible for retirement. Here, the Secretary specified that 30 percent of all line LTCs being considered could be recommended for retirement by the SERB and the actual number retired by the SERB was 25.8%. AR at 104,167–68, 173.

■ Plaintiff claims, however, that the Secretary did violate the 30 percent cap by specifying a number greater than 30 percent of the LTCs being considered. Plaintiff's theory is that by requiring that certain numbers of LTCs be retained in certain career fields, the Secretary, in effect, removed eligible LTCs from consideration without changing the number of LTCs that could be recommended for retirement. Plaintiff also alleges that by doing so the Secretary also violated 10 U.S.C. § 638(e), requiring submission of a list of all SERB-eligible officers from the most junior to most senior in the grade and competitive category. Plaintiff states, for example, that once the maximum number of

Special Forces LTCs that could be retired—six—was achieved, no more Special Forces LTCs could be considered for retirement. The court finds this logic unpersuasive because anyone of the SERB-eligible Special Forces LTCs could end up being one of the retired six. They were all still part of the group that had a chance of being retired. The Secretarial instructions satisfied both the numerical and the enumeration provisions of section 638.

■ The plaintiff also claims that the Secretary violated DoDD 1332.32 because his MOI disturbed the SERB's independent judgment and the fairness of the process. The plaintiff, however, could not cite a specific example of these values of independent judgment and fairness in the Directive which would contradict Secretarial instructions. The document sets forth only a very general charge concerning fairness and also states that the Secretary may recommend policy changes to the Directive. It does contain an express requirement that the SERB consider all eligible officers. However, as the court found above, the Secretary complied with this requirement. The court GRANTS defendant's Motion to Dismiss and for Judgment upon the Administrative Record for Counts I and II.

### III. ABCMR REVIEW

In plaintiff's third Count, he claims the ABCMR violated 10 U.S.C. § 1552 by denying plaintiff's application for an administrative remedy for the alleged illegal acts set forth in Counts I and II. Section 1552 authorizes the Secretary, acting through a board, to "correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice." *Id.*

■ The Court of Federal Claims' review "of the administrative decision is limited to whether the ... action [of the military board] was arbitrary, capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation, or mandatory published procedure of a substantive nature by which Plaintiff has been seriously prejudiced." *Clayton v. United States,* 225 Ct.Cl. 593, 595, 1980 WL 13179 (1980) (quoting

*Sanders v. United States,* 219 Ct.Cl. 285, 298, 594 F.2d 804, 813 (1979)); *King v. United States,* 19 Cl.Ct. 703, 705 (1990). Plaintiff must provide "clearly convincing proof" that the ABCMR acted in such a manner in order to prevail. *Dzialo v. United States,* 5 Cl.Ct. 554, 565 (1984); *King* 19 Cl.Ct. at 705. This court cannot substitute its "judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." *Heisig v. United States,* 719 F.2d 1153, 1156 (Fed.Cir.1983) (quoting *Sanders,* 594 F.2d 804, 813–14, 219 Ct.Cl. 285 (1979)).

Plaintiff argues that his application for administrative remedy and additional comments presented the ABCMR with sufficient evidence to demonstrate bad faith and illegalities. He further reasons that the ABCMR violated 10 U.S.C. § 1552 since it failed to seek an advisory opinion on that additional evidence or, in the alternative, failed to release the opinion to plaintiff, and ultimately denied him relief. Plaintiff made, however, no specific showing that the Board's decision was arbitrary, or capricious, or contrary to the governing statutes or procedures as interpreted earlier with respect to the first two Counts of plaintiff's complaint. Accordingly, the court must grant defendant's Motion to Dismiss as to Count III.

### IV. AMENDED COMPLAINT

On June 12, 1998, the court granted plaintiff's Motion for Leave to Amend Complaint, and now explains its ruling in greater detail as follows. Rule 15(a) of this court's rules states that leave to amend a party's own pleading after a response has been served is to be freely given when justice so requires. If, however, a response has not yet been served, a party may amend its own pleadings once as a matter of right. Other circuits have decided for purposes of Federal Rule of Civil Procedure 15(a) that a motion to dismiss is not a "responsive pleading" and, thus, the plaintiff may not need the leave of the court to file an amendment to his complaint. *See Hopi Tribe v. United States,* 20 Cl.Ct. 782, 784 (1990)(*citing Reuber v. United States,* 242 U.S.App.D.C. 370, 750 F.2d 1039 (9th Cir.1984); *Barksdale v. King,* 699 F.2d 744 (5th Cir.1983); *LaBatt v. Twomey,* 513

F.2d 641, 651 (7th Cir.1975). As this court noted in *Hopi Tribe*, leave to amend a complaint should be granted liberally. This contributes to the rationality and efficiency of the litigation. Regardless of whether a motion to dismiss is a "response," there are sufficient grounds to grant leave to amend.

The practical reasons for granting plaintiff's Motion for Leave to Amend are preservation of judicial resources and reduction in the time and money spent on the dispute by the parties. Granting leave to amend would avoid imposing filing costs, docketing, and the delay inherent in filing a separate complaint. Additionally, justice will be served by allowing the plaintiff to add this question involving common operative facts so that the court may look at the whole controversy. Failure to grant the Motion would also risk the costs of appeal should the issue be decided in favor of the plaintiff.

Defendant's first argument as to why leave should be denied is that the plaintiff has engaged in undue delay by waiting to amend the complaint until after oral argument on the Motion to Dismiss. At the time plaintiff's Motion for Leave to Amend was filed, however, no substantive motion had been decided by the court. Although plaintiff did not attempt to amend his Complaint until almost eight months after filing it, the Motion was filed about three weeks after the Federal Circuit held in *Baker v. United States*, 127 F.3d 1081, 1088–89 (Fed.Cir. 1997), that a separate complaint alleging unconstitutional affirmative action in SERB instructions should be allowed to proceed. The initial dismissal in *Baker* may have discouraged plaintiff from including the proposed amendment in his initial complaint. 34 Fed. Cl. 645 (1995), *vacated*, 127 F.3d 1081.

 Defendant also argues that since plaintiff did not raise the new allegation in his appeal to the ABCMR, the waiver doctrine precludes him from making that claim in this court. Generally, under the waiver doctrine, issues and arguments not made before the relevant military correction board or administrative agency are deemed waived and could not be raised in a judicial tribunal. *See, e.g. Laningham v. United States*, 30 Fed.Cl. 296 (1994); *Frecht v. United States*,

25 Cl.Ct. 121 (1992); *Walden v. United States*, 22 Cl.Ct. 532 (1991). Plaintiff, however, points to Federal Circuit precedent holding that although a plaintiff may not generally raise issues involving agency expertise for the first time in this Court, a plaintiff may raise a constitutional claim for the first time in federal court. In *Beard v. General Services Administration*, 801 F.2d 1318, 1321 (Fed.Cir.1986), the Federal Circuit stated that plaintiff's failure to present certain arguments to the Merit Systems Protection Board did not preclude him from raising those contentions before the court. The court went on to state that "the principle of exhaustion of administrative remedies does not always apply to constitutional challenges to the agency's action." *Id.*(citing *Hayes v. Dept. of the Navy*, 727 F.2d 1535, 1539 (Fed. Cir.1984); *Sullivan v. Dept. of the Navy*, 720 F.2d 1266, 1274 n. 2 (Fed.Cir.1983)).

Defendant asks that, if leave to amend is granted, the amended claim be remanded for ABCMR proceedings out of judicial deference for agency expertise. Plaintiff's amended complaint, however, does not deal with issues that the ABCMR has particular experience or expertise in. Plaintiff's proposed amendment deals solely with an issue of law, namely whether or not the MOI given the SERB was unconstitutional on equal protection grounds. The United States Supreme Court has stated that in these circumstances, "[c]onstitutional questions obviously are unsuited to resolution in administrative hearings and, therefore, access to the courts is essential to the decision of such questions." *Califano v. Sanders*, 430 U.S. 99, 109, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). The court cannot shrug this solemn duty off any more than it can aggrandize unto itself matters outside of its jurisdiction.

Finally, the government is not prejudiced by the amendment because the facts that the amendment relies on are already in the Administrative Record, and the court has provided the government ample time and an oral argument to respond to the new claim.

## V. FIFTH AMENDMENT DUE PROCESS CLAIM

Plaintiff's fourth Count claims a violation of the Due Process Clause of the Fifth

Amendment. Plaintiff alleges that the right to equal protection guaranteed by the Due Process Clause was infringed upon through the imposition of "unlawful gender and racially classified retention goals and selection consideration factors, and unlawful, gender and racially classified remedies for the possible disadvantages of societal discrimination." Am. Compl. ¶ 48.

The SERB was directed to attempt to retire 1,352 LTCs, but required to retire at least 1,127 LTCs. The MOI set forth four phases to this process: Phase I and Phase II are implicated in this case. In relevant part, the MOI stated the following requirement for evaluation of minority and female officers:

a. The Army is firmly committed to providing equal opportunity for minority and female officers in all facets of their career development, utilization, and progression. *The goal for this board is to achieve a percent of minority and female officers recommended for early retirement not greater than the rate for all officers in the zone of consideration.* This goal is important because, to the extent that each board achieves it, the Army at large will have a clear perception of equal opportunity and the officers not recommended for early retirement will enjoy the opportunity for continued career progression to the benefit of the Army. This goal is not intended as guidance for you to meet any "quota."

b. *In evaluating the records of minority and female officers, the board should consider that past personal and institutional discrimination may have disadvantaged minority and female officers.* Such discrimination may include, but certainly is not limited to, disproportionately lower evaluation reports, assignments of lesser importance or responsibility, and lack of opportunity to attend career building military schools. *Take these factors into consideration in evaluating these officers' potential to make continued significant contribution to the Army.*

c. Prior to recess, the board (in the report of officers recommended for early retirement) must review and report the extent to which minority and female officers were recommended at a rate greater than males and non-minority officers. Although the board may have met the overall goals for minorities and women, it will identify any situation in which minority and female selections were not comparable to the overall population in specific branches or where a particular minority-gender grouping did not fare well in comparison to the overall population. Explain such situations fully in the board's after-action report.

AR at 189 (emphasis added).

Phase I required evaluation of minority and female officers in accord with the above factors. *See* AR at 181 (directing the SERB to conduct evaluations in accordance with Enclosure 1 factors). Phase II, which was triggered if the MOI goal for minority and female officer retention was not met, required a re-evaluation of minority and female officers. The Phase I factors for minority and female officers were required to be taken into consideration again during Phase II. In this case, the Phase II revote procedure was triggered for minority officers, although not for female officers. *See* AR at 123.

Plaintiff and defendant disagree as to whether the revote procedure actually displaced members of the class who would otherwise have been retained. However, if the numerical goals, the evaluation factors for past personal and institutional discrimination, and the mere existence of the revote procedure do not meet the Constitution's requirements as plaintiff contends, then it is not necessary to resolve this factual question. Accordingly, the court begins its inquiry with an examination of the factors for the evaluation of minority and female officers.

It is clear on its face that the MOI created a race and gender-based goal and that it required consideration of different factors in evaluating minority and female officers than when evaluating white male officers. The court must now determine whether this policy crossed the line between lawful government action and unconstitutional discrimination.

## A. Racial Classification

The general requirements of the Due Process Clause of the Fifth Amendment are

quite clear: "[A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed under strict scrutiny." *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). Strict scrutiny means that "[f]ederal racial classifications, like those of a State, must serve a compelling governmental interest, and must be narrowly tailored to further that interest." *Id.* at 235, 115 S.Ct. 2097.

■ The government argues that the MOI does not create a racial classification. The court disagrees. In *Baker v. United States,* 34 Fed.Cl. 645 (1995), *vacated on other grounds,* 127 F.3d 1081 (Fed.Cir.1997), this court found that a Charge to an Air Force SERB to be sensitive to the possibility of past discrimination was not a racial classification in circumstances where there was no goal. The court pointed out that the Charge did not

> mandate that members of the SERB consider race in discharge decisions. The Charge did not establish a quota *or goal* for the percentage of minorities to be discharged. The Charge did not include race in its list of factors that SERB members should consider in making separation decisions.

*Baker,* 34 Fed.Cl. at 656 (emphasis added).

In contrast, the present case is all about a race-based goal. On its face the MOI unequivocally states: "The goal for this board is to achieve a percent of minority and female officers recommended for early retirement not greater than the rate for all officers in the zone of consideration." *See* AR at 189. Moreover, at Phase I, the MOI requires a special evaluation of minority and female officers' records under which "the board should consider that past personal and institutional discrimination may have disadvantaged minority and female officers." *See id.* In addition, the Phase II procedures, requiring the reevaluation of members of minority groups when their race did not meet the specified goal percentage and, possibly, a revote, gives members of certain races different opportunities from other races, and follows the same MOI standards for "personal and institution-

al discrimination" as set forth at Phase I. *See id.*

It is clear that the SERB had to apply different standards when evaluating minority officers than nonminority officers. If, to use an example from the MOI itself, a minority officer had not attended an elite military school or was not stationed on a prestigious assignment, the Board would have to consider whether discrimination were a cause of that circumstance. A nonminority male officer, on the other hand, would not receive this benefit. Indeed, under the generally applicable MOI rules quite the opposite is true. As to school attendance, the MOI provides that "[t]he board will not establish selection for or attendance at Command and General Staff College (CGSC), the Army War College (AWC), or their equivalent, as a substitute for evaluation of an officer." AR at 185. As to tours of duty, the MOI affirms "[t]oday's Army assignment philosophy ... that all assignments are important assignments." *Id.* at 184. The After–Action Report, likewise, candidly discloses that the SERB equaled one's minority race to another's professional performance. "Of those [minorities] revalidated for early retirement, their overall manner of performance and potential was *clearly below* that of their contemporaries." AR at 169 (emphasis added). Thus, nonminority officers were required to try harder during their careers and held to a heightened standard when evaluated against minorities than against other nonminority officers.

The government admits a racial goal, but emphasizes that its program pursued a goal rather than a quota. As a defense of a race-based affirmative action policy, however, "[t]he... rejoinder—that the Policy is not a quota—is a non sequitur." *Wessmann v. Gittens,* 160 F.3d 790, 794 (1st Cir.1998). As the District of Columbia Circuit noted in *Lutheran Church–Mo.Synod v. FCC,* 141 F.3d 344, 354 (D.C.Cir.1998), "we do not think that it matters whether a government hiring program imposes hard quotas, soft quotas, or goals. Any one of these techniques induces an employer to hire with an eye toward meeting the numerical target. As such, they can and surely will result in individuals being granted a preference be-

cause of their race." The government's assertion that there were "no resulting repercussions or adverse consequences [to SERB members] for not meeting any/all female or minority selection or retention goals," Def's. Resp. and Reply at 7, even if semantically correct, does not make the classification less suspect. To pressure SERB members into making racially tainted decisions, the MOI contains a special requirement to "fully explain" SERB's failure to reach the "goals" in an after-action report. Such reporting was plainly designed as a coercive accountability measure, not an innocuous statistical compilation. The Phase II reevaluation and revote procedures, which kick in should the special evaluation of minorities and women at Phase I fail to produce a desirable racial balance, can each be viewed as special administrative burdens imposed on SERB members.

Even if there were no numerical goal or preordained outcome, the mere existence of special procedures and invocation of special factors for evaluating minorities confirms a suspect racial classification. *See Hopwood v. Texas*, 78 F.3d 932, 937 (5th Cir.1996) ("In addition to maintaining separate presumptive TI levels for minorities and whites, the law school ran a segregated application evaluation process.") When the SERB "granted preferential treatment to [minority officers] in its layoff decisions, plaintiff received discriminatory rather than equal treatment." *Cunico v. Pueblo School Dist. No. 60*, 917 F.2d 431, 441 (10th Cir.1990). The SERB was clearly instructed to apply one standard to one racial group and a different standard to another racial group. *See Lutheran Church–MO*, 141 F.3d at 351 ("The crucial point is not . . . whether they require hiring in accordance with fixed quotas; rather, it is whether they oblige stations to grant some degree of preference to minorities in hiring."). When special procedures have been invoked in the past on the basis of racial classification, minorities generally have been the victims. While in this instance the avowed purpose may be benign, the effects of government policies are no less invidious. Shielding these procedures from judicial review is no less dangerous to minorities, for "by transforming equality into a subjective standard, the concept is reduced to a spoils

system, and . . . support for equality will depend on whose ox is gored." Clint Bolick, *Unfinished Business: A Civil Rights Strategy for America's Third Century* 35–36 (Pacific Research Institute for Public Policy 1990).

The assertion that unequal process for members of different races should not be subject to strict scrutiny is rather curious, to say the least, in the context of Due Process litigation. It is with availability of fair process for all that the Fifth Amendment Due Process Clause is traditionally concerned. Race, on the other hand, "seldom provide[s] a relevant basis for disparate treatment." *See Adarand*, 515 U.S. 200, at 228, 115 S.Ct. 2097, 132 L.Ed.2d 158 (citing *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980)(Stevens, J., dissenting)). The Supreme Court has long recognized such classifications to be "by [their] very nature odious to a free people whose institutions are founded upon the doctrine of equality" before the law. *Hirabayashi v. United States*, 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943). Government decision-making tainted by suspect, usually arbitrary classifications such as race is a special concern of the Clause. *See, e.g. Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

The government finally claims that the MOI's "limited guidance—rhetorically not offered for 'white men' because this group was never subjected to specific discriminatory acts based upon their race, ethnicity, or gender—cannot be construed as an unconstitutional 'preference' or 'benefit' bestowed upon minority and female officers." Def. Resp. and Reply at 6. This view misconstrues both the applicable law and its historical foundations. As the Fifth Circuit aptly summarized recent Supreme Court precedent, "there is absolutely no doubt that courts are to employ strict scrutiny when evaluating all racial classifications, including those characterized by their proponents as 'benign' or 'remedial.' " *Hopwood*, 78 F.3d 932, at 940 (citations omitted). As a matter of principle, case law now for over forty years recognized that the requirement of equal protection "is not directed solely against discrimination due to a 'two-class theory'—that is, based upon differences between 'white' and Negro," *Regents of Uni-*

*versity of California v. Bakke,* 438 U.S. 265, 295, 98 S.Ct. 2733, 57 L.Ed.2d 750 (opinion of Powell, J., announcing judgment of the Court) (citing *Hernandez,* 347 U.S. 475, 478, 74 S.Ct. 667, 98 L.Ed. 866 (1954)), or even between whites and "minorities" in general. Indeed, historically "the white 'majority' itself is composed of various minority groups, most of which can lay claim to a history of prior discrimination at the hands of the State and private individuals. Not all of these groups can receive preferential treatment and corresponding judicial tolerance of distinctions, for then the only 'majority' would be the new minority of white Anglo–Saxon Protestants." *Bakke,* 438 U.S. at 295, 98 S.Ct. 2733. This court will not help the government exhume a theory long put to rest by the Supreme Court.

The Constitution's scrutiny of racial discrimination covers the entire spectrum of government action, from the sweetest carrots to the heaviest sticks. *See, e.g. Adarand,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (strict scrutiny applied to a federal financial incentive program to hire subcontractors presumed economically disadvantaged because of their ethnicity). A contrary holding would resurrect the ghost of "Jim Crow" and signal that the federal government may discriminate if the responsible employees are creative or well-intentioned enough. The Supreme Court's pronouncement in *Adarand* is not ambiguous: "All governmental action based on race... should be subjected to detailed judicial inquiry to ensure that the personal right to equal protection of the laws has not been infringed." 515 U.S. at 227, 115 S.Ct. 2097 (citations omitted). It is clear that the instructions to the SERB, at evaluation, reevaluation, and during the revote, set forth different procedures for retirement of officers based on race. This policy constitutes a racial classification subject to strict scrutiny.

**B. Compelling Interest**

■ When there is a racial classification, the government has the burden of proving that its affirmative action program served a compelling governmental interest. *See Croson,* 488 U.S. at 500, 109 S.Ct. 706; *Wygant,*

476 U.S. at 277, 106 S.Ct. 1842 (plurality opinion). The court finds that none of the interests proffered by the Army, whether nonremedial or remedial, are strong enough to justify a racial classification.

*1. Nonremedial Interests.*

■ The MOI statement that the race-conscious goals were "important because, to the extent that each board achieves it, the Army at large will have a clear perception of equal opportunity and the officers not recommended for early retirement will enjoy the opportunity for continued career progression to the benefit of the Army," is an insufficient justification for the racial classification. AR at 189. As the *Croson* plurality noted, "[c]lassifications based on race carry the danger of stigmatic harm. Unless they are reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to the politics of racial hostility." 488 U.S. at 493, 109 S.Ct. 706; *see also Hopwood,* 78 F.3d at 945 ("Diversity fosters, rather than minimizes, the use of race. It treats minorities as a group, rather than as individuals. It may further remedial purposes but, just as likely, may promote improper racial stereotypes, thus fueling hostility.").

The government's desire to manipulate private perceptions can never by itself justify the use of race-conscious policies. *See Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) (plurality opinion) (1986) (asserted need for more minority role models); *Hopwood,* 78 F.3d 932 (change of perception that the law school is a hostile institution for minorities). Private attitudes are simply too subjective to rely upon as a justification for trampling an individual's right to be treated equally regardless of race. Because of this inherent subjectivity, the thought management rationale may be used to exculpate almost any instance of racial discrimination while simultaneously avoiding any meaningful judicial scrutiny. The Constitution's guarantee of equal protection of the laws presumes that private perceptions will improve when the government treats all persons consistently and even-handedly in both word and deed. But this is more than a

mere academic presumption.[1] It is a mandate embodied in the law of the land. Discrimination in the name of equality only perverts and retards this principle instead of advancing it. "Racial preferences appear to 'even the score' . . . only if one embraces the proposition that our society is appropriately viewed as divided into races, making it right that an injustice rendered in the past to a black man should be compensated for by discriminating against a white." *City of Richmond v. J.A. Croson Company*, 488 U.S. 469, 527–528, 109 S.Ct. 706, 102 L.Ed.2d 854 (Scalia, J., concurring in judgment). Without question, it is a legitimate goal to "have a clear perception of equal opportunity," but this court likewise concludes it is not a compelling government interest justifying separate procedures based upon race.

■■■ The fact that the minority officers retained will enjoy additional opportunities could be a compelling interest of the government's if there is a special interest in minorities enjoying such opportunities which is not possessed by other groups. This justification amounts, in practice, to the diversity or role models rationales rejected by the Courts of Appeals in other affirmative action contexts. *See Lutheran Church–MO*, 141 F.3d 344, 355 (D.C.Cir.1998); *Wessmann*, 160 F.3d 790, 796 (1st Cir.1998); *Hopwood v. State of Texas*, 78 F.3d 932 ("[W]e see the caselaw as sufficiently established that the use of ethnic diversity simply to achieve racial heterogeneity, even as part of the consideration of a number of factors, is unconstitutional.") (5th Cir.1996); *Podberesky v. Kirwan*, 956 F.2d 52, 56 n. 4 (4th Cir.1992). The court does not see how race could possibly be relevant in this context and the government has not proposed that minority officers possess different intrinsic qualities than nonminorities. Were it to try to do so, the government's position would be on thin constitutional ice indeed. The court holds that no compelling interest exists for this purpose.

The government argues, however, that the MOI "furthers a compelling Government interest in preventing possible past discrimination against a particular minority officer from detrimentally affecting the Army's present consideration of that officer's professional attributes and potential for future contributions if retained on active duty." *See* Def. Resp. and Reply at 37. This justification is not actually remedial: the government is setting forth a compelling interest in accurately assessing the professional attributes of the officers it reviews for retirement selection. The court finds a compelling interest would exist for the Army in such endeavors. But this program is not actually particularized as the government contends. The distinction here is subtle, but decisive, and turns on the phrase "possible past discrimination". By being a member of a minority race, an officer receives a particular interpretation of his past record, including but not limited to such things as assignments and military schools attended. Specifically, the MOI instructs the SERB to take into account that lower achievements of minority and female officers in certain areas "may" indicate discrimination. This is not the same thing as a finding that the particular minority officer was in fact discriminated against. Such an interpretation of the record does nothing to help the Army to accurately assess whether, in fact, that record was tainted by discrimination. This court will not infuse a compelling interest proffered during litigation into a racial classification scheme which is irreconcilable with that interest.

### 2. Remedial Interests.

The court finds, however, that the government has alleged a compelling government interest: remedying "actual past discrimination." In light of the MOI and the Declaration of Lt. General Frederick E. Vollrath, the U.S. Army Deputy Chief of Staff for Personnel (DCSPER), the court concludes that remedying actual past discrimination was a motivation for the Army's policy. Remedies for actual discrimination against the individual appear to be supported by a compelling interest under any current theory of the Due Process Clause. Justice Scalia's rigorous

---

1. "In the end, as any successful teacher will tell you, you can only teach the things that you are. If we practice racism then it is racism that we teach." Max Lerner, *We Teach What We Are, in* Actions and Passions: Notes on the Multiple Revolution of Our Time (1949).

view of strict scrutiny requirements, currently the minority view, would be satisfied by this understanding of the Army's affirmative action program. *See Adarand*, 515 U.S. at 239, 115 S.Ct. 2097 (Scalia, J., concurring) ("In my view, government can never have a 'compelling interest' in discriminating on the basis of race in order to 'make up' for past racial discrimination in the opposite direction. Individuals who have been wronged by unlawful racial discrimination should be made whole; but under our Constitution there can be no such thing as a creditor or a debtor race.") (citations omitted).

■ However, courts are not obligated to receive proffered remedial reasons as fact and rubber-stamp the government's race-based programs. *See Croson*, 488 U.S. at 500, 109 S.Ct. 706 (citing *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975)). If this were the case, a clever lawyer could justify every single act of racial discrimination imaginable. Rather, "where the [government] actor puts forth a remedial justification for its racial classifications, the court must make a 'factual determination' as to whether remedial action is necessary." *Wygant*, 476 U.S. at 277–278, 106 S.Ct. 1842. Because there is no Federal Circuit precedent on the precise contours of such inquiry, this court adopts the test put forth by the Fifth Circuit in *Hopwood v. Texas*, 78 F.3d 932 (5th Cir.1996).[2] Under *Hopwood*, the government must first and foremost provide the court with a "showing of prior governmental unit involved." 78 F.3d 932, 949 (citing *Wygant*, 476 U.S. at 274, 106 S.Ct. 1842 (plurality opinion) and *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977)).[3] Second, "the relevant governmental discriminator must prove that there are present effects of past discrimination of the type that justify the racial classifications at issue." *Hopwood*, 78 F.3d at 952 (5th Cir.1996). The evidence presented by defendant before the court in support of its race-based scheme falls far short of *Hopwood's* requirements.

■ As to the first prong, the court finds the MOI invalid because the relevant governmental unit here is the SERB and not the Army in general. Where an affirmative action program is imposed in a setting different in kind from the setting in which a supposed violation occurred, courts infer that the program is either motivated by some impermissible interest or is not narrowly tailored. *See Croson*, 488 U.S. at 469, 109 S.Ct. 706 (city's focus on discrimination in the construction industry at large "provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy."); *Hopwood*, 78 F.3d at 951 ("In this situation, an inference is raised that the program was the result of racial social engineering rather than a desire to implement a remedy.") These inferences arise because "when one [actor, the 1992 LTC ACC SERB,] begins to justify racial preferences based upon the actions of other [Army] agencies, [such as promotion boards, unit commanders, etc.,] the remedial actor's competence to determine the existence and the scope of the harm—and the appropriate reach of the remedy—is called into question." *See Hopwood*, 78 F.3d at 951. Equal protection caselaw abounds with examples where comparably disparate settings were rejected as improper for remedial programs. Thus, the Supreme Court in *Croson* struck down the racially preferential contracting scheme by the City of Richmond which allegedly targeted discrimination in the construction industry nationwide. Likewise, the *Hopwood* Court found that the University of Texas School of Law could not administer an

---

2. The court is satisfied by the extensive analysis of Supreme Court jurisprudence by the *Hopwood* court and notes that a similar test was articulated by the Fourth Circuit in *Podberesky v. Kirwan*, 38 F.3d 147, 153 (4th Cir.1994), *cert. denied*, 514 U.S. 1128, 115 S.Ct.2001, 131 L.Ed.2d 1002 (1995) ("To have a present effect of past discrimination sufficient to justify the program, the party seeking to implement the program must, at a minimum, prove that the effect it proffers is caused by the past discrimination and that the

effect is of sufficient magnitude to justify the program.").

3. This court agrees with the Fifth Circuit that post-*Wygant* Supreme Court jurisprudence further restricted allegedly remedial racial classifications to specific agencies that committed the racial wrongs which are sought to be remedied. *See Hopwood*, 78 F.3d at 949–952 (discussing *Croson* and other cases).

affirmative action plan supposedly to remedy racial discrimination in the secondary schools of the State of Texas or the undergraduate institutions of the University of Texas System.

The proffered remedial scopes in these cases are simply dwarfed by the breadth of the so-called remedy in the MOI. The commands, agencies, schools, installations, recruitment facilities, and duty stations of the United States Army literally span the planet. *See, e.g.* 1998 Statistical Abstract of the United States, 357–368 (118th ed.). Every year, the Army's numerous promotion, disciplinary, and retirement boards convene to make personnel decisions. Various military school selection boards, some operating jointly with other service branches, make thousands of admissions decisions. Unit commanders and personnel authorities routinely execute tens of thousands of duty station assignments. In contrast, the SERB as an institution was established with a limited mission in mind: to evaluate retirements of a certain number of Lieutenant Colonels for the 1992 fiscal year. However, by directing SERB members to accord special consideration to promotions, assignments, and military school attendance of minorities, the MOI magically transformed the 1992 LTC SERB into a super-prosecutor and a super-judge of racial discrimination practices in other Army units and boards, encumbered neither by scope, nor time, nor, apparently, evidence.

Assuming *arguendo* that the relevant governmental discriminator is the entire Department of the Army, defendant's compelling interest argument still suffers from constitutionally fatal flaws. Specifically, the meaning of "actual past discrimination" needs clarification. It appears that the regulations themselves address personal and societal discrimination, *see* AR at 189, which do not provide a compelling interest. *See Croson,* 488 U.S. 469, at 497–500, 109 S.Ct. 706 (1989). Most troubling is the express creation of a separate evaluation and revote process for minorities because they may have been disadvantaged by "past personal discrimination." It is well-settled that the government may never assert private racially intolerant attitudes as a pretext for the government's own racial

classification. *See Palmore v. Sidoti,* 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984). As the Supreme Court declared in that case:

> The question, however, is whether the reality of private biases and the possible injury they might inflict are permissible considerations ... We have little difficulty concluding that they are not. The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect. 'Public officials sworn to uphold the Constitution may not avoid a constitutional duty by bowing to the hypothetical effects of private racial prejudice that they assume are widely and deeply held.' *Palmer v. Thompson,* 403 U.S. 217, 260–261, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971) (White, J., dissenting).

*Id.* 466 U.S. 429, 433, 104 S.Ct. 1879.

Private personal discrimination does not supply a compelling interest for a racial classification. If allowed, it would make all racial classifications permissible upon a subjective showing that a person had been discriminated against somehow, somewhere, or by someone, without more.

Equally as troubling is the requirement that the evaluation of minority and female officers take into account a "lack of opportunity to attend career-building military schools." AR at 189. This "lack of opportunity" factor is all-encompassing in its reach. It indicates what social order—one full of opportunities—should have existed throughout the lives of minority and female officers, and presents an open invitation for speculation by SERB members in accordance with their own ideal world theories. This, in turn, indicates that the Army impermissibly sought to remedy past societal discrimination, and not simply "actual past discrimination." *See Wygant,* 476 U.S. at 276, 106 S.Ct. 1842 (plurality opinion) ("Societal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy.") As noted in *Croson,* "the mere recitation of a 'benign' or legitimate purpose for a racial classification is entitled to little or no weight." 488 U.S. at 501, 109 S.Ct. 706. It

seems clear from the goal itself that one purpose of the program, the remedying of "personal discrimination", does not pass constitutional muster. Likewise, to the extent the remedy for "actual past discrimination" includes the remedy for "societal discrimination," the court accordingly holds that no compelling interest existed for this purpose.

The government also fails the second prong of its evidentiary burden, one concerning present effects of past discrimination. The Supreme Court has held that the government must have "a strong basis in evidence for its conclusion that remedial action was necessary." *Croson,* 488 U.S. at 500, 109 S.Ct. 706 (quoting *Wygant,* 476 U.S. at 277, 106 S.Ct. 1842 (plurality opinion)). Although there would be a compelling interest in remedying actual discrimination, the government must prove that such a remedy was needed. In this case, the evidence presented to the court is largely statistical evidence that minorities were promoted at different rates from white officers. *See generally* Vollrath Dec., Ex. F. Moreover, the author of the report relied upon by the government to explain these statistics appears to use an interpretation of the Army promotion data which counts societal discrimination as part of the harm to be remedied: "[I]nstitutional discrimination is a difference in what happens to people in an organization—a difference which 1. is correlated with skin color; 2. results from the normal functioning of the organization; and 3. operates to the consistent disadvantage of persons of a particular skin color." *Id.* at 402. It is, finally, unlikely in this case that a compelling interest existed to remedy discrimination against all minorities.[4] *See Croson,* 488 U.S. at 506, 109 S.Ct. 706 ("The gross overinclusiveness of Richmond's racial preference strongly impugns the city's claim of remedial motivation.").

The Declaration presented by the Army to explain its program, however, expresses doubt about the meaning of the statistical disparities in promotions between different groups of officers. According to Lt. Gen. Vollrath, "[I] oversaw an examination into the reasons for the persistent discrepancy in these promotion rates. *We were unable, however, to definitively pinpoint any single systematic reason for the disparity we observed.* It was because of this *uncertainty* that the Army instituted the EO 'review' and 'revote' procedure. This procedure was crafted to examine on a board-by-board basis *the possibility* that some of the aggregate pattern we were observing was due to some actual discrimination against particular individual members of these ethnic and gender minority groups." Vollrath Dec., ¶ 62 (emphasis added). These so-called findings are a far cry from " 'pervasive, systematic, and obstinate discriminatory conduct' [necessary to] justif[y] a narrowly tailored race-based remedy." *Adarand,* 515 U.S. at 237, 115 S.Ct. 2097 (citing plurality, concurring, and dissenting opinions in *United States v. Paradise,* 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987)). There is an obvious concern that the Army's plan was not addressing the present effects of past discrimination, but merely statistical disparities it did not like, whatever the reason for their existence.

The government argues that the revote procedure at Phase II is based on actual discrimination because it is only triggered when the percentage of minority officers selected for retirement is not in proportion to the general selection rate. The court finds this logic misleading, for there is no evidence that the failure to meet the Army's chosen racial percentage goal was caused by discrimination in the first place. The government thus bootstraps inconclusive data onto

---

**4.** Minority groups other than blacks were only studied separately beginning in 1980. The evidence as to Hispanic officers indicates that they were promoted in many areas at a faster rate than other officers. *See* Ex. F. The government has not included an analysis of the statistics for the Asian/Pacific Islanders group, but they exceeded the statistics for whites in many years, and do not show a great disparity (in some years in which this group did less well, it coincided with a small officer pool). The statistics for American Indians, the government concedes, are not statistically significant due to the small numbers of eligible officers, but they show a number of years in which the percentage was higher than for whites or the eligible officer pool. As for female officers, the very government study the Army submits declares: "Army women have been promoted more rapidly than their male counterparts to almost every officer and enlisted grade, except grade 07." *Id.* at 579.

a racial classification and then purports to justify that classification on the basis of bare statistical variations in the data. As a result, defendant completely sidesteps any inquiry into the root causes of these statistical differences. However, even if Phase II revote is limited to "actual discrimination", the special evaluation or reevaluation at Phases I or II used a racial classification which applied irrespective of the percentages in a particular year. The court rejects the government's contention that only the revote procedure could raise constitutional issues. During the evaluation or the reevaluation, the SERB was required to take into account the possibility of "past personal and institutional discrimination" upon its review. This affirmative action could only have been justified by the government's statistical and anecdotal evidence, and not on the later failure to achieve the MOI numerical goal. Indeed, as plaintiff notes, the special record evaluation and revaluation also applied to female officers, and thus provided them a benefit, even though the revote procedure was not applied to them in 1992.

The Army's reliance on simple proportionality comparisons between races is not probative of discrimination, for such comparisons are appropriate for use in entry level positions cases only. *See Croson,* 488 U.S. at 501, 109 S.Ct. 706 (1989). Here, on the other hand, careers of skilled professional officers are at stake. "[W]here special qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task." *Id.* at 502, 109 S.Ct. 706. Nothing in the record before the court indicates that such an inquiry was ever made before the MOI was prepared. Accordingly, the Army should have conducted fact finding to determine the strength of the statistical evidence as proof of institutional, not societal or personal, discrimination, and whether the statistics so considered provide convincing evidence of a compelling government interest in remedying racial discrimination. As for the revote procedure, the record likewise does not indicate that sufficient evidence of institutional discrimination is provided by the revote process to create a compelling interest. Part of this

inquiry would depend on the government's ability to distinguish those minority officers who benefitted from the "personal discrimination" remedy from those who benefitted from the "institutional discrimination" remedy. Based upon the Administrative Record and the government's evidentiary submissions in support of the affirmative action program, there is no genuine issue of material fact regarding the existence of a compelling interest. The government will not be able to carry the evidentiary burden due it in equal protection cases, *see Hopwood,* 78 F.3d at 948–950, and, accordingly, a trial is unnecessary.

## C. Narrowly Tailored

■ This case may also be resolved without recourse to trial, and plaintiff's Cross–Motion for Judgment upon the Administrative Records may be granted if the government's affirmative action policy is not narrowly tailored. As the *Adarand* court explained, even with a compelling governmental interest, the racial classification "must be narrowly tailored to further that interest." 515 U.S. at 235, 115 S.Ct. 2097. Indeed, "racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Id.* at 236, 115 S.Ct. 2097 (quoting *Fullilove v. Klutznick,* 448 U.S. 448, 535, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (Stevens, J., dissenting)).

### 1. *Less Intrusive Means*

■ The Army's tailoring of its policy to cover "personal discrimination," at both Phases I and II, is unconstitutional. Also, the government has not shown how "institutional discrimination" is different from societal discrimination. As was explained above, remedying societal discrimination is not a compelling government interest. Indeed, the Army's remedy for societal discrimination is not particularly well-tailored to that purpose, as it instructs the SERB to take into account societal discrimination which "may" have had an impact on the officer. Assuming, *arguendo,* the constitutionality of the affirmative action remedy in all other respects, the goal and revote procedure should have required

consideration of "institutional discrimination" alone, omitting reference to the wrongs of society or individuals. By not doing so, the policy failed the constitutional requirement that it be "narrowly tailored."

In fact, the government's view of this case in terms of remedying discrimination in Army promotions underlines how difficult it would be for this affirmative action plan to meet strict scrutiny. Affirmative action in minority retirement selection is not the least intrusive means to remedy Army discrimination in promotions. In *Wygant*, the plurality rejected a plan which involved termination of senior nonminority teachers to retain less senior minority teachers. The plurality concluded that the plan was not narrowly tailored because "[o]ther, less intrusive means of accomplishing similar purposes—such as the adoption of hiring goals—are available." *See Wygant*, 476 U.S. at 283, 106 S.Ct. 1842.[5] Although the facts of this case are less severe than in *Wygant*—minorities merely receive an opportunity to be retained which is unavailable to nonminorities—the applicable rule is identical. There are less intrusive means of battling the effects of discrimination in Army promotions.

The government could always use targeted affirmative action measures at the hiring or recruitment stage to remedy past institutional discrimination in promotions. Additional promotions might be made as long as there was no discrimination based on race against nonminority officers. To the extent affirmative action goals were necessary to remedy prior discrimination, promotion goals implemented at a board responsible for the identified institutional discrimination would show the most exact connection with the least intrusive burden. As a result, there is not "the most exact connection" between the justification and the classification in this instance.

### 2. Duration of the Policy

■ Racial and gender classifications based on remedying past discrimination may not have an infinite life span; to be narrowly

tailored, there must be some circumstance which would end the need for the affirmative action policy. Thus, the *Adarand* Court remanded to the Court of Appeals because that court had not decided, under the strict scrutiny standard, "whether the program was appropriately limited such that it will not last longer than the discriminatory effects it is designed to eliminate." 515 U.S. at 238, 115 S.Ct. 2097 (citations and quotations omitted). In *Wygant*, the plurality eschewed a "role model" justification for an affirmative action plan because it "allows the Board to engage in discriminatory and layoff practices long past the point required by any legitimate remedial purpose." 476 U.S. at 275, 106 S.Ct. 1842. *See also Croson*, 488 U.S. at 510, 109 S.Ct. 706 (noting importance of findings "to assure all citizens that the deviation from the norm of equal treatment of all racial and ethnic groups is a temporary matter."); *Wygant*, 476 U.S. at 310, 106 S.Ct. 1842 (plurality opinion) ("In the absence of particular findings, a court could uphold remedies that are ageless in their reach into the past, and timeless in their ability to affect the future."). As the *Wygant* plurality stated, there must be some "logical stopping point." *See Wygant*, 476 U.S. at 275, 106 S.Ct. 1842. None exists for the Phase I minority selection standards, and likewise, upon a closer look, for Phase II reevaluation and revote procedures.

■ In *Stewart v. Rubin*, 948 F.Supp. 1077 (D.D.C.1996), a promotion case permitting reevaluation for minorities upon which the government puts great weight in support of its program, the court explained that one of the reasons its reevaluation procedure was narrowly tailored was its short and definite duration. That "interim procedure [was] also short term—i.e., it will not be used once the new promotion systems are implemented. The temporary nature of the provision [was] an important factor in support of approval." *See id.* at 1098. No such protections are in place here. The government in this case has not stated that its program will end for female officers when there are no longer for-

---

5. Justice O'Connor, concurring, did not reach the issue of hiring goals versus layoffs. *See Wygant*, 476 U.S. at 293–294, 106 S.Ct. 1842 (O'Connor, J., concurring). However, she did not disagree with the plurality's substantive reasoning, and her opinion in *Adarand* requires this court to apply strict scrutiny to all racial classifications.

mer members of the WAC in the Army, or that it will not use the MOI affirmative action guidelines in future years, or that certain concrete evidence that there is no longer a compelling interest in remedying past Army discrimination will terminate the affirmative action policy. Instead, it appears that this program may continue for as long as the Army makes use of SERBs.

Defendant argues its affirmative action plan is of temporary duration because the revote procedure is only triggered where a goal is not achieved. It would, under that theory, no longer be triggered when the Army no longer has racially unbalanced statistics. But a mere failure of the SERB to meet the Army's self-imposed goal is not discrimination. Failure to meet the goal would not, on its own, constitutionally justify a revote. If, for example, twenty years passed, anecdotal evidence was minimal, and promotion rates were identical across races and gender, there is no assurance the revote would not still be triggered whenever a SERB failed to meet its goal. This is not indicative of a short duration. Furthermore, notwithstanding the fact that the revote procedure has no obvious end date, the government's argument fails because the goal itself is a racial classification which applies at both phases of the SERB procedure.

*3. Race–Neutral Alternatives.*

■ "In determining whether race-conscious remedies are appropriate, we look to several factors, including the efficacy of alternative remedies." *United States v. Paradise*, 480 U.S. 149, 171, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987). The government has not, on this record, attempted race neutral alternatives prior to implementing its affirmative action program. *See Croson*, 488 U.S. at 507, 109 S.Ct. 706 (expressing concern with an affirmative action plan because "there does not appear to have been any consideration of the use of race-neutral means.").

One neutral possibility would be to apply the goal and revote procedure to all races and both genders. The government appears convinced that race and gender discrimination has not harmed white male officers. But presumably the symptoms of race and gender discrimination, which the government assures the court its SERB was highly trained to detect, see Def's. Br. at 32, would also be recognizable if they ever occurred in the white male context. This remedy might require more time and effort, but, as discussed in the *Baker* case, it has been used before. Moreover, administrative efficiency is no excuse for a racial classification. *See Croson*, 488 U.S. at 508, 109 S.Ct. 706 ("[T]he interest in avoiding the bureaucratic effort necessary to tailor remedial relief to those who truly have suffered the effects of past discrimination cannot justify a rigid line drawn on the basis of a suspect classification.").

Another possibility would be to provide additional training and preparation for top military schools or prestigious assignments to officers from educationally underprivileged backgrounds of all races. This approach will expand the pool of qualified applicants by benefitting those who were in fact denied opportunities for advancement due to discrimination and other factors. It will provide real assistance to real victims. This approach will also help address any societal discrimination concerns the Army may have, yet without employing a suspect classification.

*4. Additional Problems.*

■ Another concern about the affirmative action program would apply to the "institutional discrimination" remedy. Among examples of institutional discrimination provided in the MOI which the SERB should look for are assignment to a station of lesser importance or responsibility and disproportionately lower evaluation reports. The difficulty with these standards is that they do not eliminate instances in which an assignment of lesser importance came from nondiscriminatory sources (including the personal wishes of the officer), or instances in which the lower evaluation report came from simple poor officer performance. There is no evidence in the record providing a standard which distinguishes the different causes of lower officer evaluations. On its face, the program appears to protect minorities and

814

female officers who did not suffer from past discrimination. Thus, a hypothetical SERB officer is likely to read the MOI and provide a revote to a minority officer who had a low evaluation report who had never been discriminated against. A nonminority officer, in the same context, would not receive this benefit. The government argues against such possibilities because of the equal opportunity training it provides to its officers, but this does not change the fact that the racial classification leaves these factors open to broad discretion. Such a discretion violates the requirement that the remedy be narrowly tailored.

Recent circuit court decisions have held that compelling interests do not include the desire to protect a race from underrepresentation: "Underrepresentation is merely racial balancing in disguise—another way of suggesting that there may be optimal proportions for the representation of races and ethnic groups in institutions." *Wessmann*, 160 F.3d 790, 799 (citing *Lutheran Church–MO*, 141 F.3d at 352). Racial balancing, of course, is not an acceptable justification for a racial classification, and the court finds these holdings persuasive for that reason. The government's policy appears to be tailored to prevent underrepresentation, and not to remedy past racial discrimination. Notably, the revote procedure would not be triggered to protect a victim of past discrimination who was selected in a year when his or her overall race or gender group did well compared to all eligible officers. Female officers did not benefit from the revote procedure during the 1992 FY SERB, yet this fact hardly indicates that female officers were not harmed by past discrimination if the government's interpretation of statistical and anecdotal evidence is to be believed.

In *Wessmann v. Gittens*, 160 F.3d 790 (5th Cir.1998), the plaintiff, Sarah Wessman, had been denied admission to an "examination school," Boston Latin School (BLS), and sued under the Equal Protection Clause of the Fourteenth Amendment. Examination schools are public secondary education institutions operated by the City of Boston, which require entrance examinations for admissions. BLS had used a complex admissions

system, under which an applicant had to be in a qualified applicant pool (QAP), which was comprised of the top 50% of the applicants to the school, ranked by a combination of the applicant's test score and grade point average. Half of the admissions were then based entirely on the applicant's ranking. The other half were decided based on the proportions of each race in the remaining qualified applicant pool (RQAP), after the top half was removed. BLS would fill its remaining open seats based on rank order, but only insofar as the number of students from each racial/ethnic group matched its proportion in the RQAP.

The *Wessmann* court found the affirmative action program was not narrowly tailored because, among other reasons, if one racial minority did particularly well in one year, and was poorly represented in the RQAP, it could be displaced by white and Asian students. Although the affirmative action program in this case does not function with the potential to discriminate against its alleged beneficiaries, it does ignore their plight whenever the number of minorities or women selected for retention is especially high. This indicates a greater emphasis on racial and gender percentages than on rectification of tangible past wrongs. The revote procedure, thus, "cannot be said to be narrowly tailored to any goal, except perhaps outright racial balancing." *Croson*, 488 U.S. at 507, 109 S.Ct. 706.

The court concludes that the Army's affirmative action program for the 1992 FY SERB was not narrowly tailored, and therefore violates the Due Process Clause of the Fifth Amendment. Both the evaluation aimed at attaining the goals and the revote procedure, if the goals are not met, call for the SERB to "take into consideration" factors including "but certainly not limited to, disproportionately lower evaluation reports, assignments of lesser importance or responsibility, and lack of opportunity to attend career-building military schools." AR at 189. A racial classification tailored to remedy personal and societal discrimination and to assure racial balancing is included at both stages, and, not surprisingly, does not come

close to the exact fit required of a constitutional remedy for institutional discrimination.

## D. Gender Classification

 The MOI goal and revote procedure represent a gender classification for the same reasons stated above in the racial classification context. *See* AR at 188–9. Without repeating that discussion, the court simply notes that the MOI incorporates female officers into the identical policy required for minority officers. The standard of review for gender-based classifications is intermediate scrutiny. *See Mississippi University for Women v. Hogan*, 458 U.S. 718, 724, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982). "[C]lassifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).

However, in a recent decision on gender-based classifications, *United States v. Virginia*, 518 U.S. 515, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996), the Supreme Court emphasized that "[p]arties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action." *Id.* 518 U.S. at 529–531, 116 S.Ct. at 2274 (citations omitted). The Court did not indicate it was overruling its precedent of intermediate scrutiny, and cited cases which applied the intermediate scrutiny standard in support of its opinion. Previously, the Supreme Court has cautioned lower courts that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decision." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). For precisely this reason, the Eleventh Circuit has applied the *Virginia* case as a continuation of the intermediate scrutiny standard for gender-based classifications. *See Engineering Contractors Assoc. of South Florida, Inc. v. Metropolitan Dade County*, 122 F.3d 895 (11th Cir.1997) (holding that remedy for societal discrimination is permitted under intermediate scrutiny).

Without delving further into this issue, the court believes its holding with respect to the unconstitutional racial classification is sufficient to grant summary judgment to plaintiffs on Count IV. "When a case presents two constitutional questions, one of which disposes of the entire case and the other of which does not, resolution of the case-dispositive question should suffice." *American Mfr. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 62, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999) (Ginsburg, J., concurring in part and in judgment). In this case, the conclusions that the racial classification contained in the Army's MOI was not narrowly tailored to meet any compelling government interest and that no compelling interest was present renders unnecessary any decision on the gender-based classification contained therein. Any nonminority male was potentially harmed by the constitutional infirmity of the race-based selection standards mandated by the Army, since any such officer could theoretically have received a closer and more deferential evaluation or a revote if it had such a benefit, at Phase I or at Phase II. The harm would be identical whether or not the gender-based program is constitutional, since the standards applied by the SERB were the same for both minority and female officers. The court hereby GRANTS plaintiff's Motion for Summary Judgment on Count IV.

## VI. CLASS CERTIFICATION AND MOTION TO INTERVENE

 The Court of Federal Claims possesses broad discretion in determining whether a class certification is appropriate. *See* RCFC 23 ("The court shall determine in each case whether class action may be maintained and under what terms and conditions."); *cf.* Fed.R.Civ.P. 23 (setting forth mandatory criteria for determining propriety of class actions). In *Quinault Allottee Ass'n v. United States*, 197 Ct.Cl. 134, 453 F.2d 1272 (1972), several factors were suggested to consider when deciding a motion for class certification. The court should consider whether: 1) there is a large but manageable class; 2) a common question of law; 3) a

common legal question that predominates; 4) plaintiff's claim is typical; 5) the challenged government action is generally applicable; 6) claims of the purported class are too small to be pursued individually; and 7) plaintiff will adequately represent the interests of the purported class.[6] The court also considers whether certifying the class would serve the overall interests of justice by addressing possible statute of limitations problems or other concerns. *See Berkley v. United States,* 45 Fed.Cl. 224, 234 (1999).

None of the above factors, together or separately, represent a hard-and-fast rule. *See id.* at 229. Rather, in light of this court's jurisdiction over non-tort claims for money damages against the United States, the propriety of class certification is evaluated in light of the type of the substantive claim pending before the court and the facts out of which it has arisen. This case requires the court to evaluate the propriety of class actions in federal employment compensation cases.

In his Motion for Class Certification, as amended, plaintiff proposed two classes for the court's consideration. The first, or original, class consists of four alternative classes. The first alternative encompasses all Army Lieutenant Colonels retired by the SERB. The second and the third such alternatives include all Lieutenant Colonels in several specified categories who were retired by the SERB. The fourth alternative is limited to retired Lieutenant Colonels in plaintiff's field, Air Defense Artillery. The second, or amended, class consists of all male non-minority Lieutenant Colonels retired by the SERB. The proposed classes are tailored to substantive claims in plaintiff's Counts, with the four alternatives in the original class related to the first three Counts and the amended class related to Count IV.

With respect to Counts I through III, plaintiff's harm stems from the fact that he was a member of an undesired career field or skill and that he was mandatorily retired—an individual claim. In applying the *Quinault* factors, the court determines, among other things, that there is not a question of law common to the whole class and that the plaintiff's claim is not typical of the whole class. Plaintiff's claim turns on his particular circumstances—his career field, skill, and, notably, his military record. This hinders his ability to protect class members' interests as well, since all the LTCs mandatorily retired by the SERB were in different career fields or skills, and, if the action by the SERB were illegal, it would affect the LTCs who were retained as well. In light of the court's finding of broad Secretarial discretion to use the SERB process to address the personnel needs of the Army, potential factual differences between the military record of the plaintiff and other class members are even more significant. Finally, it appears that plaintiff's allegation of arbitrary and capricious review by the ABCMR rests on that Board's failures to get an advisory opinion or to provide its opinion to plaintiff—actions which are peculiar to plaintiff's claim. For these reasons, plaintiff's Motion for Class Certification as to the first three counts is DENIED for the entire original class.

▮ Count IV, however, raises an entirely different set of issues. All male non-minority LTCs selected for retirement by the 1992 SERB, i.e. all members of the amended class, were excluded from the benefits of the Army's Phase I and Phase II minority racial or gender factors and goals; likewise, all such individuals were excluded from the benefits of the revote procedure. The analysis for Count IV parallels the application of *Quinault* factors in *Berkley v. United States,* 45 Fed.Cl. 224 (1999), another recent case involving racial and gender discrimination in separation of military officers from service. *Taylor v. United States,* 41 Fed.Cl. 440 (1998), is instructive as well.

Accordingly, the court finds that the male nonminority officers selected by the SERB

---

6. The eighth *Quinault* factor, assessing the risk that individual actions would create varying adjudications, is moot in light of post-*Quinault* statutory changes making the decisions of trial courts under the Tucker Act and the "little Tucker Act" subject to appellate review exclusively in the Federal Circuit. The only exception to this exclusive review scheme are the tax claims brought under the "little Tucker Act." *See Berkley,* 45 Fed.Cl. at 234 (1999) (citing case law interpreting 28 U.S.C. §§ 1295(a)(2) and 1346(a)(2) (1994)).

for retirement would comprise a large but manageable class. While the record before the court contains data by separate race and gender categories, it does not show the exact number of male nonminority Lieutenant Colonels retired by the SERB at issue. The unavailability of the precise number of potential plaintiffs is a function peculiar to the secrecy with which SERBs operate to protect the privacy of individual officers and the integrity of their internal decision-making. However, at oral argument, the parties did not dispute existence of a large, but manageable class as to Count IV. Were the issue contested, the parties could have petitioned for the court's assistance to craft discovery measures adequate in scope and subject to appropriate protections. As in *Berkley* and *Taylor*, the potential class members are connected with, and easily identifiable through, the Army records. They are presumably receiving regular communications from defendant related to their retirement. As every other Rule, RCFC 23 "shall be construed to secure the just, speedy, and inexpensive determination of every action." RCFC 1(a)(2). Finding that the first *Quinault* prerequisite is satisfied advances this principle.

The court also notes that the issue of constitutionality of the MOI in light of the equal protection commands of the Due Process Clause is common to amended class members selected, and that the nature of this legal issue renders factual differences among class members practically irrelevant. The second and third *Quinault* factors are satisfied where the legal claim asserted by all potential class members has a defense which is also applicable to all, and where a common legal determination as to liability is possible regardless of the potentially varying determinations as to remedies. *See Berkley*, 45 Fed.Cl. at 232 (relying on *Taylor*, 41 Fed.Cl. at 446). The liability for subjecting the amended class members to unconstitutional racial classifications and discriminatory procedures is but a single question of law. Any and all of the government's defenses, if sustained, would have justified the harm commonly suffered by all class members because of their gender and race. The defenses, even the so-called remedial justifications, were not based on factual distinctions between the amended class members. Further, plaintiff clarified the amended class definition to exclude certain officers based on a finding of unsatisfactory performance by the Army Grade Determination Board. Any other factual differences among the potential class members are relevant only in the context of determining damages and other relief, such as correction of records.

Plaintiff, a white male, certainly presents a case typical to others in the amended class in light of allegations in Count IV. The MOI's "one ... unconstitutional mandate [that] was the cause of plaintiff['s] loss of equal protection" satisfies *Quinault's* requirement of general applicability of government action. *Berkley*, 45 Fed.Cl. at 232 (citations omitted). Coupled with lack of conflicts of interest, plaintiff's persistent pursuit of the case through administrative, congressional, and judicial channels demonstrates that he would adequately represent the class interests. Coincidentally, this record of persistence also establishes that assertion of individual claims is likely to be incredibly time-consuming and cost-prohibitive "for some, if not many." *Berkley*, 45 Fed.Cl. at 233.

Finally, the circumstances involving the application to intervene pursuant to RCFC 24 by Lt. Col. Billy Nix likewise support granting certification on Count IV. "Prior decisions have suggested that an expiring statute of limitations is a 'legitimate concern' when deciding whether or not to certify a class, and one which weighs in plaintiff's favor," *Berkley v. United States*, 45 Fed.Cl. at 234 (1999) (citing *Moore v. United States*, 41 Fed.Cl. at 400, and *Armitage v. United States*, 18 Cl.Ct. at 315), although this factor is not outcome-determinative if outweighed by the other factors, *see id.* In his *pro se* Motion, Lt. Col. Nix admitted filing past the statute of limitations, but claimed that the statute was tolled by commencement of plaintiff's class action under the rule of *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983).

Lt. Col. Nix requested intervention as of right to protect his interests in the event that the court declines to certify the class, or if the action is settled or voluntarily dismissed.

Alternatively, he requested permissive intervention because of commonality of factual and legal issues with the plaintiff's case. Like Lt. Col. Christian, Lt. Col. Nix is a white male officer retired by the 1992 LTC ACC SERB. However, Lt. Col. Nix served in the Aviation Corps, while plaintiff served in the Air Defense Artillery. Given these facts, Lt. Col. Nix would be would be included into the first, second, and third alternative definitions of the original class as well as the amended class. He would be excluded from the fourth alternative. Although Lt. Col. Nix's Motion mirrors plaintiff's claims and remedies sought, it does not make any claims related to plaintiff's Count III, the ABCMR review.

We held in *Barbieri v. United States,* 15 Cl.Ct. 747 (1988), that filing of a class action under Rule 23 of the Court of Federal Claims tolls the statute of limitations just as it does under the Federal Rule of Civil Procedure 23. Otherwise, the court reasoned, "potential class members . . . 'would be induced to file protective motions to intervene or to join in the event that the class was later found unsuitable' . . . [and] the utility of the class action device would be largely undermined." *Barbieri,* 15 Cl.Ct. at 751 (citing *American Pipe and Construction Co. v. Utah,* 414 U.S. 538, 553, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). Precisely such protective concerns were asserted by Lt. Col. Nix.

Related considerations inform the court's decision whether to certify a class at all. Were the certification refused here, many retired officers, a number of them *pro se,* would be forced to file intervention motions or initiate their own suits to avoid the statute of limitations. Because the operative events of this controversy took place approximately five years prior to the filing of the Complaint in this case, the access of other similarly situated officers to the court would be significantly constrained. Timely suits, on the other hand, would likely burden the court through a backlog of similar cases and the likely need for extensive travel to accommodate all the plaintiffs. These problems will be avoided through the use of a class action device.

Weighing the applicable *Quinault* factors, the Court finds class certification of the amended class (with plaintiff's clarification for AGDB determinations as discussed above), to be appropriate. The court also finds a traditional opt-in procedure to determine the ultimate composition of the class to be appropriate in this case. *See, e.g. Berkley,* 45 Fed.Cl. at 235 (certifying an opt-in class). It makes good sense, then, for the court to DENY intervention and to TREAT this Motion to Intervene as an affirmative request to join the class.

Plaintiff's Amended Motion for Class Certification is GRANTED as to liability on Count IV and Lt. Col. Nix is INCLUDED in the plaintiff class.

## VII. REMEDIES

Plaintiffs Christian and Nix seek reinstatement to active duty at the rank of Lieutenant Colonel with accrual of time-in-grade, time-in-service, and ordinary leave from the dates of their selection for retirement; pay, allowances, emoluments, and other pecuniary benefits from the date of their retirement to the day of reinstatement; correction of their military records to remove evidence of their retirements; consideration for schools and promotion opportunities lost due to the retirement; and, attorney's fees and costs, plus interest.

The court requires further proceedings on the question of remedies, especially in light of the class certification on liability. The parties are DIRECTED to submit within thirty (30) days a proposed date for a status conference on the issue.

## CONCLUSION

For the foregoing reasons, the government's Motion to Dismiss and for Judgment upon the Administrative Record is GRANTED with respect to Counts I, II, and III, but DENIED with respect to Count IV. Plaintiff's Cross–Motion for Judgment on the Administrative Record is GRANTED with respect to Count IV, but DENIED as to Counts I, II, and III. Plaintiff's Motion for Class Certification is GRANTED as amended on liability with respect to Count IV, and DENIED with respect to Counts I, II, and

III. Applicant's Motion to Intervene is DE-NIED, but Applicant–Intervenor is IN-CLUDED in the plaintiff class with respect to Count IV.

It is so ORDERED.