**Walter D. SMALL, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 94–618 C.**

United States Court of Federal Claims.

July 8, 1996.

---

Guy J. Ferrante, King & Everhard, P.C., Falls Church, Virginia, for plaintiff.

Armando O. Bonilla, with whom were Assistant Attorney General Frank W. Hunger, Director David M. Cohen, Assistant Director James M. Kinsella, Department of Justice, Washington, D.C., and Lt. Col. Steven J. Pecinovsky, Department of the Air Force, Arlington, Virginia, for defendant.

## OPINION

WIESE, Judge.

## I

### Introduction

Plaintiff is a former major in the Regular Air Force who was twice passed over for promotion in rank to the grade of lieutenant colonel and thereafter was involuntarily separated from the military upon completion of the twenty-year service period required for retirement pay eligibility.[1] In this suit, he seeks review and reversal of a decision of the Air Force Board for Correction of Military Records (Correction Board) denying his application for a correction of records that would have (i) deleted the pass-overs in promotion, (ii) ordered reinstatement to active service, and (iii) granted constructive service credit together with back pay measured from the date of involuntary retirement.

The case is now before the court on cross-motions for summary judgment. There are two principal issues to be decided.[2] The first

---

1. Title 10 of the United States Code, section 632(a), requires the discharge, or retirement, if eligible, of an officer of the Regular Air Force holding the rank of captain or major, after such officer "has failed of selection for promotion to the next higher regular grade for the second time." Pursuant to this section, Major Small became subject to involuntary separation in 1988 but was selectively continued under 10 U.S.C. § 637 until reaching retirement eligibility.

2. After an initial review of the issues raised in the parties' briefs, the court became convinced that these issues demanded a better common understanding of the factual record and the arguments drawn therefrom. To that end, a conference was called at which each side was given the opportunity to explain the facts it was relying upon and the law it deemed applicable to those facts. As a result of this conference, a number of arguments were withdrawn and others were refined. The

concerns the administrative procedure that was followed by plaintiff's major command, the Air Force Systems Command, Space Division, in determining the level of indorsement to be accorded an officer's performance evaluation report (OER). The contention, developed in more detail below, is that the procedure introduced, into the OER preparation process, reliance upon personnel data of the sort whose use was specifically prohibited by the governing regulation, Air Force Regulation (AFR) 36–10 (Nov. 1982). The other argument plaintiff raises here is that the selection boards that considered his record for promotion (the calendar year 1987 and 1988 lieutenant colonel selection boards) were in violation of law because, among other things, these boards conducted their business in panels rather than as single, deliberative bodies. This panel system, and the administrative procedures it entails, are claimed to be violations of 10 U.S.C. §§ 616 and 617.

The parties were given an opportunity to brief these issues and oral argument in respect to them was heard on June 27, 1996. After careful consideration, we conclude that plaintiff is not entitled to prevail on either issue.

## II

### Facts and Discussion

*The OER Issue.*

Air Force Regulation 36–10 is the administrative guideline that sets out the requirements governing the preparation and processing of OERs. This regulation contemplates an officer evaluation system keyed to the chain of command, *i.e.,* each officer's performance is evaluated by a "rater" (the officer's immediate supervisor), by an "additional rater" (the rater's rater), and by an "indorser" (the additional rater's rater). This hierarchy, however, is not cast in stone. Commanders are given some latitude in structuring the reporting chains for their respective commands. Thus, while raters must be identified and assigned before the closeout date of a ratee's report (indeed, every officer must know who his primary rater is), this re-

quirement of pre-identification does not apply either to additional raters or to indorsers. In fact, the regulation allows indorsement chains to be established "by supplement to this regulation or by common usage in the unit." AFR 36–10 ¶ 2–23b. "This flexibility," the regulation explains, "provides a further opportunity to achieve differentiation [among ratees] and recognizes that both level of indorsement and indorser grade have an impact on those who use the OER." *Id.* at ¶ 2–23a. In short, the regulation vests commanders with discretion in determining the level of indorsement to be applied to a given OER.

The problem that we encounter here centers on the procedure that the Space Division put into place in order to identify those OERs that merited a higher level of indorsement, *e.g.,* indorsement by, say, a chief commander as opposed to a vice commander. As demonstrated in the record before us, that procedure involved the rater's preparation of a separate form, an OER Indorsement Request Form, that accompanied the OER and that presented a brief summary of an officer's military record including the information complained about here: "Times Passed Over To Next Grade." On the reverse side of this same form the rater was required to indicate a suggested level of indorsement (along with a proposed text for the indorser's comments) and to provide a justification supporting the suggested indorsement and text. Upon completion, this form, together with its related OER, was then forwarded to the base personnel office for review there to assure compliance with prescribed format and completeness of data entries.

In this case, plaintiff's rater, Colonel William E. Sawyer, Commander of the 6592 Air Base Group, prepared an OER for the twelve month period ending April 17, 1987, that graded plaintiff "well above standard" (the highest possible scoring) in each of the listed performance factors. Additionally, on the accompanying OER indorsement request form, Colonel Sawyer suggested that the OER be indorsed by the chief commander of

result is the case we now have before us for

decision.

the Space Division—an office then held by a three-star general. In support of this recommended indorsement, Colonel Sawyer wrote: "Major Small is in the top 5 percent of all majors under my command. Outstanding commander, Headquarters Squadron Section and dual-hatted administrator. Promote now." The OER and the requested indorsement form were then forwarded to the consolidated base personnel office. And it is here—with the actions taken by the base personnel office—that plaintiff's grievance begins.

The base personnel office reviewed the forms and then, by handwritten entry, made the following observations with respect to Colonel Sawyer's suggested indorsement and the likelihood of its being sufficient to influence the promotion process:

Maj. Small is a long shot for 05 [promotion to lieutenant colonel] whether with AFSC/CC or SD/CC [whether indorsed by Air Force Systems Command, Chief Commander or Space Division, Chief Commander]

—1 X passover probably for reasons listed in [attached] memo

—not on list of officers identified as still promotable after last board by HQ AFSC/APX [Headquarters, Air Force Systems Command, Military Personnel Plans Branch]—therefore AFSC/CC ind [indorsement] would be doubtful

—no point in using precious SD/CC ind for someone whom it would not help ([staff] agencies are "entitled" to 6 [three-star] ind and have used 1 of them)

—ABG/CC [Colonel Sawyer] put little effort into justification or text of ind toward winning 3 [star] ind.

Following the notation of these comments, the form was then circulated among the command personnel of the Space Division to elicit their recommendation as to the appropriate level of indorsement. The routing stamp indicates unanimous agreement among these officers—the Space Division's director of personnel management, the executive officer, the chief of staff for administration, the

chief of staff and the vice commander—that Major Small's OER receive a vice commander indorsement rather than a chief commander indorsement. Upon the completion of this routing, the requested indorsement form, together with its handwritten commentary, was then returned to the rater, Colonel Sawyer, for further action.

Although the record is not entirely clear on the point, it would appear that, upon receipt of the circulated indorsement form, Colonel Sawyer agreed with the recommended step-down in indorsement level by changing his recommended indorsement from "CC" to "CV" (from chief commander to vice commander), and by striking the text of his earlier indorsement justification noting, in lieu thereof, the following: "Major Small is a one time passover to Lt. Col. He did not have his SSS [Senior Service School] complete last yr. Has now done that. It would take a AFSC/CC to push him over the top and I am not willing to go that high. A SD/CC would be nice but a CV will be good."

Upon the conclusion of the OER preparation administrative process, there was entered into plaintiff's record an OER that reflected the performance ratings initially made by Colonel Sawyer, the indorser comments as initially drafted by Colonel Sawyer ("Major Small has turned into a key problem solver. He will make a good lieutenant colonel. Promote this board") and the signature of the agreed-upon indorser—the Space Division's vice commander, Major General Donald J. Kutyna.

The problem plaintiff sees in this administrative scheme is its use of and reliance upon a prior promotion passover as the central factor in determining the recommended level of indorsement. Reliance on that factor, argues plaintiff, deprived him of his rater's unencumbered judgment, reinforced the negative aspects of his service record and, most importantly, transgressed the restriction that AFR 36–10 places against the use of prior promotion passovers in the OER evaluation process.

In substantiation of his position, plaintiff points, first of all, to section 1.7 of AFR 36–10. That section, titled "Guidelines for Eval-

uation," cautions evaluators (meaning both raters and indorsers) that they "should not attempt to prejudge whether a ratee will or will not be selected by a future [promotion] board." More particularly, the regulation states:

> [S]election board eligibility status, such as previous nonselection, is not an entry on the selection brief provided to selection boards and should not form the basis for a decision to make a recommendation or to assign a particular potential rating.

To drive home its point, the regulation goes on to provide a list of items that should not play a part in the OER evaluation process or find their way into an evaluator's comments in an OER. Promotability is on this list. The relevant section, section 3–14, titled "Inappropriate Items," reads as follows:

> Certain material is inappropriate and must not be considered in the evaluation process or included in comments in evaluation reports or indorsements to them. Do not consider or refer to:
>
> . . . .
>
> f. An officer's potential for promotion to general officer, if the officer is serving below the grade of colonel.

Plaintiff contends that the level of indorsement accorded an OER bespeaks an evaluation of that officer as much as do the ratings given to the performance factors called out in the OER. And since it clearly is impermissible under the guidelines of AFR 36–10 to take account of an officer's promotion passovers in determining the ratings to be assigned to those performance factors, so likewise is it impermissible to bring those passovers into play in deciding the level of indorsement to enter on the OER. The short of the matter, argues plaintiff, is that he was deprived of the opportunity to fairly compete for promotion by virtue of an indorsement that was unlawfully determined and that lacked the *gravitas* necessary to distinguish his record relative to his peers.

The Government responds to this attack by invoking essentially the same reason that was given by the Correction Board, namely, that the caution expressed in the regulation against permitting prior passovers to influence the rating process applies only to the OER in chief, and not to the supplementary process used to determine the OER's level of indorsement. According to the Government, a rating and an indorsement are not the same thing. The rating process is concerned with documenting an officer's performance in a particular assignment during a particular time period and assessing his promotion potential based on that performance; the indorsement process (referring to the process described herein) is an attempt to highlight those officers who are particularly deserving of recognition, *i.e.*, to "achieve [the] differentiation" contemplated by AFR 36–10, ¶ 2–23a.

These are not insubstantial arguments—each states its case well. Indeed, what gives the arguments their strength is that each finds support in the language of the regulation. But therein also lies the difficulty: on the one hand, the regulation cautions against allowing promotion passovers to affect the objectivity of the performance rating while, on the other hand, it recognizes the desirability of identifying and rewarding superior officers through an enhanced indorsement. Accomplishment of this latter objective necessarily invites canvassing a service member's entire military record (rather than just assessing performance during the rating period) in order to develop the data necessary to support the recommendation for a deserved higher level indorsement. Thus, promotion passovers are bound to come to light.

 How is this conflict to be resolved? Unfortunately, the problem does not admit of a judicial solution. As the court pointed out in *Murphy v. United States*, 993 F.2d 871 (Fed.Cir.1993) the possibility of an error in a military service member's record is not enough to vest the court with power to act. Judicial review, the court explained, "is only appropriate where the Secretary's discretion is limited, and Congress has established 'tests and standards' against which the court can measure his conduct." *Id.* at 873. That is what is missing here. There are no standards that we may look to to test the legality of the Air Force's actions. Indeed, the regulation and the practice under it reflect policy judgments by the Air Force on matters of

personnel management—an area which traditionally has been recognized to be "off-limits" to the courts. *Orloff v. Willoughby,* 345 U.S. 83, 93, 73 S.Ct. 534, 539–40, 97 L.Ed. 842 (1953) ("judges are not given the task of running the Army."). Therefore, in the absence of a statute prohibiting the Air Force from implementing the regulation in the manner described, the court is without authority to interject itself in this dispute.[3] For lack of any law to apply, the court must abstain.

*The Promotion Board Issue*

Turning to the other issue in the case, the central contention is that the selection boards that were convened in 1987 and 1988 to consider candidates for promotion to the rank of lieutenant colonel were illegally constituted because those boards conducted their business in panels rather than as single, consolidated bodies. This panel system, described below, is claimed to violate, in a number of respects, the requirements of the statutes prescribing the selection board procedures, 10 U.S.C. §§ 616, 617 (1994). A subordinate contention that plaintiff also raises here is that the selection boards were in violation of a governing Department of Defense Directive, DOD 1320.9 (1981), in that they simultaneously considered for promotion officers in different competitive categories rather than just officers, like Major Small, who made up the so-called "line of the Air Force."[4]

As background to our consideration of these issues, we begin with a brief description of the procedure that the Air Force follows in distributing officer selection records for evaluation for promotion. To start with, the officers who are designated to serve on the selection board (generally numbering about 40–45 officers) are broken down into subordinate panels for their independent scoring of records and their recommendation of officers for promotion.[5]

At the outset of a board, and prior to actual scoring of records, board members are formally briefed as to the scoring procedures and then participate in a practice scoring exercise. During this exercise, each board member reviews the same sample records and scores each record (using a scale of six through ten in half-point increments) and then the board members are informed of the overall results. Thereafter, the sample records are reviewed by the entire promotion board and scoring variations between individual board members are discussed with a view to establishing a board standard of scoring.

Following this training, the actual records of the "In-the-Promotion Zone" (IPZ) and the "Above-the-Promotion Zone" officers [6] are distributed among the panels. The Air Force uses a reverse social security number method of distribution, meaning that the last four digits of each eligible officer's social security number is read from right to left. Groups of twenty records are then sequentially assigned to each of the panels (*i.e.,* records 1 through 20 are assigned to panel one, records 21–40 to panel two, etc.) until all records are distributed.

Panel members score each record separately. As soon as a panel has reviewed and scored a block of twenty records, the scores given to each record by each of the panel members are totaled and the total score given to each record is then aligned in its relative order of merit (numerical ranking) within the records scored by that panel.

---

3. The regulation was issued by the Secretary of the Air Force pursuant to the authority granted by 10 U.S.C. § 8013(g)(3). This section provides that:

 (g) The Secretary of the Air Force may—
 . . . .
 (3) prescribe regulations to carry out his functions, powers, and duties under this title.

4. Air Force line officers are those officers who are not in the judge advocate, chaplain, or health profession career fields.

5. The 1987 Lieutenant Colonel Central Selection Board was comprised of 42 voting members broken down into six panels. Each panel reviewed the records of approximately 1200 candidates for promotion.

6. The terms "In-the-Promotion Zone" and "Above-the-Promotion Zone" refer, respectively, to those candidates who are being considered for promotion along with their contemporaries, *i.e.,* when first eligible based upon years of service, and those candidates who are being considered for promotion after their contemporaries, *i.e.,* officers previously non-selected.

Each panel receives a proportionate share of the entire board's promotion quota based upon the number of records that panel scored. After a panel has completed scoring all of the records that were distributed to that panel and has aligned the records according to their relative order of merit, the panel's proportionate share of the promotion quota is then applied to the scored records, starting from the top of the order of merit and moving down through the numerical rankings until the promotion quota is exhausted. As a rule, when a panel's proportionate quota is applied to that panel's relative order of merit, the numerical scoring level at which the promotion cut-off point occurs contains more records than can be accommodated within the panel's promotion quota. Records in that score category are referred to as records in the "gray" zone. When gray zone records appear, the panel is required to rescore these records in order to eliminate the duplicative scores. For example, if a panel's promotion quota is, say, 50 candidates, and 45 records fall into score categories above the gray zone and ten records are in the panel's gray zone, the panel must rescore the 10 gray zone records in order to determine the five best.

Prior to the convening of each promotion board, the eligibility criteria, method of selection, promotion quota, and statistical data are submitted to and approved by either the Secretary of the Air Force or the Assistant Secretary of the Air Force for Manpower and Reserve Affairs. At the conclusion of each promotion board, the board formally submits a written report to the Secretary of the Air Force apprising him/her of the results of the promotion board's session.

█ Moving on now to plaintiff's arguments, the principal contention is that a selection board is statutorily obliged to conduct its business as a unified body and not in panels. The argument relies on the wording of 10 U.S.C. § 616(c) and 10 U.S.C. § 617(a), in particular, the underscored text. Section 616(c) provides:

(c) A selection board convened under section 611(a) of this title may not recommend an officer for promotion unless—

(1) the officer receives the recommendation of *a majority of the members of the board;* and

(2) *a majority of the members of the board* finds that the officer is fully qualified for promotion. [emphasis added].

The other statute, Section 617(a), reads as follows:

(a) Each selection board convened under section 611(a) of this title shall submit to the Secretary of the military department concerned a written report, signed by each member of the board, containing a list of the names of the officers it recommends for promotion and certifying (1) that the board has carefully considered the record of each officer whose name was furnished to it under section 615 of this title, and (2) that, in the opinion of *a majority of the members of the board,* the officers recommended for promotion by the board are best qualified for promotion to meet the needs of the armed force concerned ... among those officers whose names were furnished to the selection board. [emphasis added].

As plaintiff interprets it, the requirement called out in these statutes for action by "a majority of the members of the board" (underscored in the above-quoted text) demands a selection process in which each officer's record is reviewed by each member of the selection board. Plaintiff argues that the procedure followed by the board of having each panel approve the promotion determinations of the other panels is not an acceptable means of satisfying the demands of a "majority" determination. Referring to this procedure as "promotion for proxy," plaintiff says that it amounts to no more than empty ritual—each panel blindly adopting the results reported by other panels and passing off the combined results as majority action. The absence of informed judgment on the part of the selectors, argues plaintiff, deprived him of the individual consideration that the statutes mandate and precludes treating the board's action as bona fide majority action.

We do not agree with this argument. There is no indication in the texts of the statutes that Congress intended the term "majority vote" to take on more than its

everyday meaning: a vote by more than half of those eligible to vote. That understanding of the term is found at Section 43 of *Robert's Rules of Order:*

### Majority Vote—the Basic Requirement

[T]he basic requirement for approval of an action or choice by a deliberative assembly, except where a rule provides otherwise, is a *majority vote.* The word *majority* means "more than half"; and when the term *majority vote* is used without qualification—as in the case of the basic requirement—it means more than half of the votes cast by persons legally entitled to vote, excluding blanks or abstentions, at a regular or properly called meeting at which a quorum ... is present. [italics original.]

*Robert's Rules of Order* § 43, at 395 (Henry M. Roberts III & William J. Evans eds., 9th ed. 1990).

Nothing in this definition supports the argument that a majority vote requires an assembled deliberative body or, for that matter, first-hand knowledge on the part of the deliberators of the act or proposition under consideration. To become the act or choice of the body, all that is required is a numerical showing that more than half of the members present and voting have each registered their approval (or disapproval) of the proposition in question. *Cf. Committee to Elect Lyndon La Rouche v. Federal Election Comm'n,* 613 F.2d 834, 847 n. 22 (D.C.Cir.1979) (requirement calling for Committee action to be authorized by majority vote was held to be satisfied when five of six voting members returned without objection a staff memorandum stating that "if no objection is raised within 24 hours, the staff will proceed as outlined above."). Plaintiff has read more into the text of the statutes than the words allow.

■ The second, and larger issue that we next turn to is whether the panel system holds out the risk of recommending for promotion officers who would not be selected for promotion were their records to be reviewed in the context of the entire group. To put the issue more concretely, is there sufficient assurance of a uniform distribution of records (assessed from a qualitative standpoint) to warrant the selection board's report and recommendation under 10 U.S.C. § 617 that "the officers recommended for promotion ... are [the] best qualified for promotion?"

To explain: The problem that is created by dividing the class of promotion-eligible candidates into separate sub-groups is that, upon completion of the evaluative scoring of the promotion candidates by the various selection board panels, each sub-group will exhibit a mean or average score that will vary, plus or minus, from the mean or average score of the promotion group taken as a whole.[7] The variance between the average score of the whole group and the average score of a sub-group is due to a difference in the quality of the records distributed: no sub-group will exhibit a distribution in quality of records that perfectly replicates the distribution of the entire group. This observation remains true even if we assume that the numerical scoring of the promotion candidates by the various panel members is carried out with complete objectivity.

The consequence of this deviation from the universal mean is that each selection panel can be expected to demonstrate a different score level at the promotion cut-off point. What this means in practical terms is that a candidate who fails of selection in a particular panel (because he or she happened to be part of a higher scoring sub-group) may well have achieved a score that would place that individual at or above the promotion cut-off point of a different selection panel. Thus, absent additional corrective steps, the sub-grouping of promotion candidates holds out the distinct possibility that some individuals who fail to win promotion would, in fact, be promoted were their records to be evaluated within the context of the entire group while other individuals, recommended for promotion, would not receive that recommendation were their records scored against the entire group.

7. Although we describe the variance problem by reference to the "mean or average score," it would be more accurate to say that the variance occurs in the promotion cut-off percentiles.

The Air Force recognizes the existence of the problem [8] and has instituted various measures to address it. Among these are the following:

After each panel has scored at least 240 of the records allotted to it, an initial scoring run order of merit for each panel is then generated. The point at which the In-the-Promotion Zone (IPZ) and the Above-the-Promotion Zone (APZ) promotion rates fall is identified on each panel's order of merit. This sample gray zone for each panel is then reviewed by the Selection Board Secretariat staff and the board president to determine if the quality of records in each panel's gray zone is the same. Further quality review of records within two points above and below each panel's gray zone is repeated after each additional group of approximately 240 records is scored by the panel. For example, if panel one's gray zone is at a score of 40, all of the records receiving a score of 40 by panel one, as well as records receiving scores ranging from 38 to 42 by that panel, are reviewed by the Selection Board Secretariat staff and the board president.

Once the gray zone is established for each panel, the board president also utilizes a computer model as a management tool to assist with insuring scoring consistency among the panels. This model, used prior to 1992, and during the 1981–1991 boards, included the use of a Project Order of Merit.

The project order of merit is a product of an analysis of the prior year's promotion selection results, weighing various factors such as professional military education, officer performance report ratings, and duty assignments, to predict how a sample record would fare under the prior board's analysis. These factors are among numerous quality factors which the analysts derive from the prior year's selection board results, and they provide a tool for the board president to use in insuring consistency in scoring and equal distribution of quality in the records among panels. Quality factors, such as whether an officer had "firewall" officer effectiveness reports (reports with the highest rating to the right), would allow a record to predictably rank higher on the project order of merit than an officer with less than "firewall" OERS.

The board president also compares the actual order of merit of the current board against the computer-generated order of merit from the project order of merit. If the board president, using this quality review method, believes that there exists a scoring inconsistency, he/she can redirect records to a second panel for rescoring. However, the decision to recommend or not recommend candidates for promotion remains exclusively within the province of the promotion board members. The project order of merit is simply a management tool, viewed only by the board president and the Selection Board Secretariat, to assist the board president in insuring: (1) consistency in scoring; (2) that records of equal quality are distributed among the panels; and (3) that only the best qualified officers are recommended for promotion.

Throughout the entire quality review process, the board president also routinely reviews 20% of the total IPZ and APZ records

8. A declaration accompanying the Government's brief, prepared by Colonel Michael A. Schiefer, currently Chief of the Plans and Analysis Division, Directorate of Customer Assistance at Randolph Air Force Base, Texas, reports the results of a computer simulation involving the distribution, among six panels, of 6,000 records, 55% of which were APZ records and 45% of which were IPZ. This simulation, which was conducted 100 times (to replicate 100 years of promotion boards) was analyzed to determine how closely the distribution of records matched the overall composition of the board, *i.e.*, the 55% APZ—45% IPZ distribution. The analysis revealed that:

> if 100 years of promotion boards were held, less than 2% of the records would have to be exchanged between the panels in 93 of those years to ensure an equitable quality distribution. In 6 out of 100 years, between 2 and 2½% of the records would have to be exchanged. In only 1 out of 100 years, between 2½ and 3% of the records have to be exchanged to ensure equity in quality between the panels.

Colonel Schiefer's declaration goes on to note, however, that:

> [t]hese results must be tempered with the fact that the IPZ/APZ status of an officer's record, although considered the most significant, is a single quality factor considered by the promotion board in its subjective determination as to which officers are the best qualified for promotion.

presented to the promotion board. Whenever the board president has any reservation about the score given to a particular record or the quality of records distributed to a particular panel, the board president can direct that records be rescored by another panel. Historically, approximately 2% of the total IPZ and APZ records are routinely reviewed by a second panel at the direction of the board president to insure equality in scoring and quality distribution and to insure that only the best qualified officers are recommended for promotion.

These then, are the measures that were relied on by the Air Force during the years in question (1987 and 1988) to assure uniformity in the distribution of records among panels. The question is whether they are enough to overcome the variance problem that use of the panel system introduces. Plaintiff insists they are not. Plaintiff points out that insuring uniform distribution of APZ/IPZ records merely tracks one predictor of promotion while other factors such as education, commendations and command experience, which also play a role in the evaluation of an officer's suitability for promotion, go unchecked. For plaintiff then, there is no satisfactory means of overcoming the imperfect distribution of evaluation factors that can be seen in the profile of each subdivision of a single promotion group. Accordingly, plaintiff maintains that nothing less than a review of all records by a single selection board can truly determine which officers are best qualified for promotion.

We do not agree with plaintiff. The court is convinced that adherence to the safeguards identified here assured an equal distribution in quality of records among the promotion panels. Particularly significant to the court's conclusion is the across-the-board review that is made of all those candidates falling within two scoring grades, above or below, each panel's promotion cut-off point. This review, conducted in light of the predictive data made available from the project order of merit (the computer-based weighing of the preceding year's selection criteria), assures that the quality of the candidates being recommended for promotion are substantially the same *notwithstanding any variations in the quality of the records distributed among the panels or any subjective differences in the weighing of evaluation factors among the panels' members.* In other words, the grade distribution among panels becomes irrelevant if the quality of the records at the panel cutoff points is seen to be the same. These safeguards are sufficient to insure the integrity of the selection process. The court so holds.

The panel system of evaluating selection records was adopted by the Air Force as a means of reviewing all eligible records within a relatively short time in order to avoid the potential for inconsistent scoring that could result from board member fatigue brought on by an extended selection process. This concern, placed in the context of the preceding discussion, leads us to conclude that the Air Force's decision to carry out the promotion selection process through use of the panel system represents a legitimate exercise of personnel management authority that is not inconsistent with law. In short, plaintiff's challenge to the panel system does not state an actionable claim.

The final point we consider is plaintiff's contention that he was considered for promotion by a selection board convened in violation of DOD 1320.9. Among other things, this directive specifies that "[s]eparate selection boards shall be convened for each competitive category and grade." Plaintiff contends that he was evaluated for promotion along with officers from other competitive categories, *i.e.,* chaplains, judge advocates and medical specialists. This inter-category evaluation, he maintains, is a violation of DOD 1320.9.

The short answer to plaintiff's contention is that there is no evidence in the record to support his assertion. The point deserves no further attention.

### III

### Conclusion

For the reasons stated, defendant's motion for summary judgment is granted and plaintiff's cross-motion for summary judgment is

denied. The Clerk is directed to enter judgment dismissing the complaint.