**Major Richard S. THUMSER, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 94–1064C.**

United States Court of Federal Claims.

Aug. 27, 2002.

John A. Wickham, Evergreen, CO, for the plaintiff, Major Richard S. Thumser.

Jan M. Folena, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, for United States, With her on briefs are Robert D. McCallum, Jr., Assistant Attorney General, David M. Cohen, Director, and James M. Kinsella, Deputy Director, Captain Andrew Leblanc, United States Air Force, General Litigation Division, is of counsel.

## OPINION

BRUGGINK, Judge.

The issue at bar is whether plaintiff, a former officer in the Air Force, has presented sufficient grounds for the court to overturn a ruling by the Air Force Board for Correction of Military Records ("AFBCMR") and reinstate him to the position he occupied before being involuntarily discharged. The matter was stayed twice; once pending reconsideration by the AFBCMR and then again during litigation of *Small v. United States*, 37 Fed.Cl. 149 (1997), *aff'd* 158 F.3d 576 (Fed.Cir.1998). Pending are plaintiff's renewed motion for judgment on the administrative record and defendant's cross-motion for judgment on the administrative record. Oral argument is deemed unnecessary. For the reasons set out below, defendant's motion is granted and plaintiff's motion is denied.

## BACKGROUND

*Nature of the Case*

Plaintiff, Richard S. Thumser, while a Major on active duty in the United States Air Force, was assigned to duties requiring travel on official temporary duty ("TDY") from September 1984 through December 1987. On June 24, 1987, Maj. Thumser was placed under an Article 32 investigation by the Air Force Office of Special Investigations ("AFOSI") for suspected fraud and abuse of government travel regulations in the course of his TDY travel. Although the court-martial charges were dropped in March 31, 1989, the investigation caused one of Maj. Thumser's superior officers, Lieutenant Colonel ("LTC") Edwin Hawley, to write a Letter of Reprimand (LOR) and establish an Unfavorable Information File ("UIF") on April 5, 1989. On May 1, 1989, Maj. Thumser received an unfavorable Officer Performance Report ("OPR"). He was subsequently passed over for promotion to Lieutenant Colonel by four

consecutive promotion boards from 1990 through 1993 and was involuntarily retired from the Air Force on October 31, 1994.

On February 12, 1992, plaintiff argued before the AFBCMR that, although an Article 32 investigation concerning him found no basis for the charges against him, his commander chose to presume his guilt, in spite of clear and convincing evidence to the contrary. Plaintiff requested that the AFBCMR void the following adverse personnel actions contained in his personnel record: (1) a 1989 LOR; (2) an UIF; (3) a 1989 unfavorable OPR; and (4) two Promotion Recommendation Forms ("PRF") prepared for the 1990 and 1991 Central Lieutenant Colonel Selection Board. Plaintiff further requested that AFBCMR correct his records to show that he was selected for promotion to LTC by the 1990 Central LTC Selection Board and award him a Meritorious Service Medal for his service from 1984 to 1990, back pay, date of rank, and other entitlements associated with retroactive promotion. The AFBCMR denied all of plaintiff's requests.

On December 12, 1994, Plaintiff filed this action, seeking review of the AFBCMR denial. In November 1995, the proceedings were stayed to allow the AFBCMR to consider new evidence. On June 27, 1995, the AFBCMR again denied plaintiff relief. Plaintiff subsequently filed an amended complaint. The case was stayed a second time pending the decision of the Federal Circuit in *Small v. United States,* 158 F.3d 576 (Fed. Cir.1998), *amended by* 180 F.3d 1343 (1999), and for reconsideration of additional evidence by the AFBCMR. On October 19, 2000, the AFBCMR again denied plaintiff relief. On December 21, 2001, plaintiff filed a renewed motion for judgment on the administrative record, in response to which the government cross-moved.

*Facts*

Plaintiff, serving at Carswell Air Force Base ("Carswell AFB") in Texas, was assigned to duties requiring TDY travel from September 1984 through December 1987. Plaintiff was listed on "blanket travel orders" dated October 1, 1986, which authorized him to "proceed at such times as may be necessary during the period 1 Oct[.] 1986 through 30 Sep[.] 1987, both dates inclusive, from Carswell Air Force Base, Texas, to any point within the continental limits of the United States of America on Temporary Duty." Plaintiff's TDY required travel from Carswell AFB to Offutt Air Force Base ("Offutt AFB") in Omaha, Nebraska. Air Force Regulations ("AFR") require TDY travel costs to be kept to a minimum. AFR 36–20 ¶ 6–1(a) (1988).

The Article 32 investigation of Maj. Thumser by AFOSI for suspected fraud and abuse of government travel regulations in the course of his TDY travel revealed that on various occasions between August 25, 1986 and May 16, 1987, Maj. Thumser made several reservations through the Schedule Airline Travel Office ("SATO") for trips to Omaha via Chicago on United Airlines despite the fact that that route was more expensive than traveling to Omaha via Kansas City. According to the Investigating Officer's Report, these travel arrangements cost the government an estimated $646.00. The investigation also revealed that Maj. Thumser had accumulated over 90,000 frequent flyer points with United Airlines since 1984. These points allowed Maj. Thumser to receive two award certificates, each good for a round trip airline ticket to the United Kingdom, which were sent to Maj. Thumser on or about May 20, 1987. Maj. Thumser tried to return the award certificates at three different SATO offices, but the personnel in those offices were unable to accept the certificates. Maj. Thumser eventually returned them to United unused.

TDY is approved for the following purposes: (1) "TDY from home station and return for the purpose of attending courses of instruction;" (2) "TDY en route to the next PCS base for the purpose of attending courses of instruction;" (3) "TDY from home base and return for the purpose of carrying out Air Force duties;" and (4) "TDY en route to the next PCS base for the purpose of carrying out Air Force duties." AFR 36–20 ¶ 6–1(a). Waivers are considered when "uncontrollable circumstances develop and TDY will not end in the time authorized." *Id.* ¶ 6–1(b).

In her deposition during the Article 32 investigation of Maj. Thumser, SA H. Dorothy Kiger, a special agent of the Air Force Office of Special Investigations, revealed that there are permissible reasons for deviating from lowest fare routing. She testified that, while use of the least expensive means of air transportation was generally required, more "costly class, i.e. first class" accommodations could be employed when: time was of the essence in regard to a particular official undertaking; the traveler was handicapped; "exceptional circumstances" were recognized by the Secretary of the Air Force; sanitation or health standards were subpar; etc. AFR 36-20, in its chapter pertaining to TDY, states:

> An authorization for variations in itinerary permits the omission of travel to any place stated in the travel order, and grants changes in the order of places shown, as necessary for getting the job done. Usually, the purpose of a trip and places of TDY are known at the time that a travel order is published. The authorizations for variation in itinerary does not take the place of good planning. This authority is not to be read as granting blanket travel authorization.

*Id.* ¶ 6-3 (1988). AFR 36-20, in a paragraph entitled "Management at TDY Sites," further states that "The CBPO (or Personnel activity) that serves the TDY site: ... Aids the commander of the TDY unit in returning officers as soon as possible due to emergencies or humanitarian conditions." *Id.* ¶ 6-8(a).[1] The commander of a TDY unit has the authority to release deployed officers for return to their assigned unit "when an emergency or humanitarian condition justifies prompt return." *Id.* ¶ 6-8(b).

The Investigating Officer's Report following the Article 32 investigation summarized the testimony of Air Force witnesses to the effect that "whether [plaintiff] had authority to travel a route other than the government contract route or the lowest fare route" was an area that "appeared to be very gray with respect to the particular reasons justifying the deviations."

In response to plaintiff's petition for correction of his records, Colonel Edwin F. Hornbrook, a USAF Staff Judge Advocate speaking on behalf of the AFBCMR on July 24, 1992, stated that "arranging official travel to accommodate a member's visitation with a family member—without some proper, official approval—has never constituted a proper basis for utilizing more expensive means of official travel."

Plaintiff's spouse, Mrs. Thumser, began having life threatening cardiac difficulties in December 1986. At that time, she underwent implantation of a permanent pacemaker. Due to progressive malfunctions, Mrs. Thumser received a new pacemaker implant in April 1987. In the summer of that year, she was diagnosed with cervical cancer, as well as a "breast lump." Mrs. Thumser underwent more heart surgery in the fall of 1987, as well as a hysterectomy and a breast biopsy to deal with her cervical cancer and breast lump. Also during this time period, plaintiff's thirteen year old daughter was diagnosed with Attention Deficit Disorder.

Mrs. Thumser's medical conditions improved from life threatening to stabilized status in late December 1987; however, her heart problems remained serious enough to merit enrollment in the Air Force's Exceptional Family Member Program ("EFMP") in 1990. Under the EFMP, military members in plaintiff's circumstances can receive special consideration in future assignments in order to be placed in military installations where the necessary services are available either through military or civilian resources. AFR 36-20 ¶ 5-11(a). The Air Force has never disputed the "genuineness" of Mrs. Thumser's ailments.

Plaintiff's superiors, LTC Robert Hageman, plaintiff's commanding officer, and LTC Vorry Moon, plaintiff's supervisor, were aware of his wife's medical condition during 1986 and 1987. These senior officers were also plaintiff's rating officials for his "Officer Effectiveness Reports" [OERs] from 1985 through April 1987. In the spring of 1987,

---

1. Other Air Force Regulations recognize the relationship between the accomplishment of military duties and "Dependent Care" responsibilities to family members. *See* AFR 30-53, 35-59.

LTC Hageman left the Squadron and was replaced by a LTC Hawley.

In May 1987, LTC Hawley informed LTC Moon that Maj. Thumser was under investigation for possible fraudulent purchase of airline tickets. LTC Moon conveyed this information to Maj. Thumser. After an Article 32 investigation, Maj. Thumser was charged with three violations of the Uniform Code of Military Justice: (1) suffering the loss of government currency, (2) dereliction of duty, and (3) attempted theft of government property. See UCMJ art. 108, 92, 80, respectively.

The basis of charge (1) was that Maj. Thumser allegedly willfully caused the United States to lose approximately $646 by failing to utilize the least costly commercial flights available when traveling at the government's expense. Specifically, Maj. Thumser routed himself through Chicago's O'Hare Airport rather than Kansas City, which was cheaper, because the Chicago route required less total travel time, even though it was longer geographically. Charge (2) alleged that he willfully failed to account to the United States for airline bonus points he earned while traveling at the government's expense. Charge (3) alleged that Maj. Thumser attempted to steal property of the United States in the form of two airline award certificates worth approximately $1940.

The investigating officer's report concluded that none of the three specific charges were supported by the evidence. However, the report stated that while the evidence did not support a charge of attempted theft (charge (3)), Maj. Thumser's conduct regarding the award certificates, specifically, his receipt of the certificates and subsequent failure to turn them in to the correct Air Force personnel, constituted a dereliction of duty, a violation of article 92. The report recommended that, although the evidence would support a charge of dereliction of duty regarding the award certificates, in light of the "confusing nature of this subject matter" and the fact that Maj. Thumser never personally benefitted, a court-martial should not be convened. Rather, the report stated that a reprimand appeared to be the "the more appropriate means of discipline."

In response to the investigating officer's report, LTC Hawley wrote an LOR dated April 5, 1989. In the LOR, LTC Hawley criticized Maj. Thumser for the following: routing his TDY travel through Chicago for his own convenience at least eight times, including four times after acknowledging by signature that that route was more expensive; misleading LTC Moon and LTC Hawley regarding whether SATO or Maj. Thumser himself was responsible for selecting the Chicago route; misleading LTC Hawley by saying that the Chicago route allowed Maj. Thumser to spend more time with his wife; receiving two airline certificates and failing to turn them in to proper Air Force personnel as opposed to United Airlines. The LOR further claimed that Maj. Thumser's return of the award certificates with a letter stating, "I find at this time my wife and I are unable to use this award certificate" was additional evidence of Maj. Thumser's "questionable intent."

In his response to the LOR, Maj. Thumser asserted that SATO had approved his travel arrangements and bore responsibility for the price of the plane tickets. Maj. Thumser disputed LTC Hawley's assertion of "questionable intent" regarding the award certificates and reiterated his claim to have made numerous attempts to return the milage award certificates or the credit therein to the Air Force. Maj. Thumser also emphasized the report of the Article 32 Investigation, which recommended against convening a court-martial.

The LOR was placed in an UIF, which LTC Hawley created for Maj. Thumser. The LOR and the Article 32 investigation were specifically cited in the OPR covering January 1, 1989 through April 30, 1989, in which Maj. Thumser was given a rating of "Does Not Meet Professional Standards" under Professional Qualities. Maj. Thumser subsequently received a "Do Not Promote This Board" recommendation on the PRF prepared for the 1990 promotions board. The PRF stated that Maj. Thumser "received a letter of reprimand on 5 Apr. 1990 for circuitous travel, false statements to superiors, and not turning in bonus certificate IAW (joint travel regulation.)" Maj. Thum-

ser was not selected for promotion to the grade of lieutenant colonel four times from 1990 to 1994 and was involuntarily retired on October 31, 1994.[2]

On February 12, 1992, Maj. Thumser first petitioned the AFBCMR to correct his records. Maj. Thumser testified before the AFBCMR that at the time of the TDY travel at issue, he was Chief of Command Control Curriculum Development for all of Strategic Air Command (SAC). Maj. Thumser was charged with developing "from scratch" a complete training program for command post controllers SAC-wide. Maj. Thumser claims that because his command was "effectively a 'satellite operation' of HQ SAC," he had to make many TDYs to Offutt AFB and other bases throughout the command.

Maj. Thumser further testified that all of his TDYs were "very last minute," consequently he sought only flights that would allow him to depart from Dallas Fort Worth Airport ("DFW") at the last possible moment and return flights which would ensure the earliest possible departure depending upon actual TDY release times.[3] He also claims that, although the United Airlines' "hub system" required routing through Chicago, the United connections usually required much less time on the road during normal duty hours. Plaintiff claims that, although the ground distance was longer through Chicago than Kansas City, connection time was much longer in Kansas City—involving a four to five hour wait before connection with a different carrier. Therefore, plaintiff says, the route with a layover in Kansas City actually took longer than the Chicago route.[4] Maj. Thumser, claimed before the AFBCMR that these factors made the United route via Chicago more attractive by providing him more flexibility to meet his wife's need for assistance while still allowing him to meet his official travel commitments.

Maj. Thumser also claimed that his airline reservations were conducted through SATO and he "assumed that SATO . . . had worked to insure that my travel was consistent with government directives." Maj. Thumser claims that his superiors were aware that he was arranging his TDY travel with the intention of reserving as much time for his ailing wife as possible.

Maj. Thumser presented the AFBCMR with substantial evidence that LTC Moon shared his understanding of the events giving rise to the Article 32 investigation. In a Jan. 21, 1992 letter, LTC Moon disputed LTC Hawley's accusation in the LOR that Maj. Thumser had misled LTC Moon regarding his travel through Chicago. LTC Moon stated that he did not believe that Maj. Thumser "deliberately lied to me about the travel routings, and I don't believe Lt. Colonel Hawley's portrayal of my conversation with Major Thumser is a reasonable basis to allege that Major Thumser lied to me about his travel arrangements." LTC Moon went on to assert that the "whole issue was being blown out of proportion," and the LOR should have been " 'desk drawered' anyway." Finally LTC Moon alleged that the charges against Maj. Thumser were "inaccurate and unjust" and that the command "chose to 'railroad' " Maj. Thumser.

The Air Force did not dispute the genuineness of Maj. Thumser's wife's illness, but it rejected the assertion that her illness was the reason for Maj. Thumser's choice of travel routes. The Air Force also rejected Maj. Thumser's claim that he was travelling through Chicago because it took less time than the route through Kansas City. Instead, it accused Maj. Thumser of taking the longer

---

**2.** A Major would normally be involuntarily retired after two non-selections to LTC pursuant to the Air Force's "up or out" promotion policy. 10 U.S.C. § 632(a)(2). Maj. Thumser's performance record, however, permitted him to be considered for promotion two additional times.

**3.** Plaintiff alleges that these flight departure times were "hardly ideal" and would normally "inconvenience" the average duty traveler.

**4.** Plaintiff's counsel filed his own affidavit with the AFBMCR regarding his own conversations with United Airlines officials. He testified that the travel time to DFW via Kansas City averages over two hours more than air travel via Chicago. He also testified that, "the number of flights on [United Airlines] departing from Omaha through Chicago to DFW offered more flexibility and shorter connection (layover) times than flights on other airlines departing from Omaha through KC to DFW."

Chicago route to accumulate extra frequent flier points even though he knew that the alternate routing was more expensive.

The AFBCMR also concluded that the accusations in the LOR regarding alleged misstatements by Maj. Thumser to his superiors about SATO's role in arranging his travel plans were supported by the factual record. The AFBCMR held that SATO's acquiescence to Maj. Thumser's travel plans may have been a valid defense to a criminal charge, but that it did not negate the accusations of the LOR: specifically that the Chicago routing was at the request of Maj. Thumser and that that route was more expensive. These facts demonstrated to the AFBCMR that Maj. Thumser was, at the very least, guilty of poor judgment. The AFBCMR also concluded that LTC Moon's statement of January 21, 1992, was merely LTC Moon's attempt to "put the best possible 'spin on the ball' concerning the applicant's [Maj. Thumser] situation."

The AFBCMR also concluded that the failure of the Article 32 investigation to lead to a court-martial was not controlling. The accusations in the LOR were different from the criminal charges raised by the investigation and were not subject to the same burden of proof as criminal charges. In sum, it found that there was no basis for the relief sought.

Maj. Thumser petitioned the AFBCMR for reconsideration of his petition at least two more times. In addition to the record from his previous petition, he presented new evidence from his superiors, LTC Moon and LTC Hageman, regarding the alleged latitude he was awarded in scheduling TDY travel.

On September 14, 1995, LTC Moon submitted a written declaration to the AFBCMR that stated that it was "common knowledge" in the command that Major Thumser was granted "flexibility in routing and departure times to allow more time with his wife and family." LTC Moon claimed to have been delegated the responsibility as supervisor of insuring that Major Thumser's ticketing went through SATO. Therefore he stated that it would be "not only ridiculous but illogical" to think that he or the command was unaware that Major Thumser was the one selecting certain flight times.

LTC Hageman, Maj. Thumser's commander from 1985 until the spring of 1987, also offered support for Maj. Thumser. On August 28, 1998, LTC Hageman stated, in a written declaration, that:

I delegated certain types of responsibilities, as referred to by Vorry Moon, by permitting Major Thumser to make TDY route deviations if it allowed him more time with his wife. I was appropriately informed that during this time Major Thumser had many TDY commitments and traveled often, but this would become hardship when his wife became seriously ill in 1986 and 1987. As a result, I fully stand behind Vorry Moon's statement.

The testimony of LTC Moon and LTC Hageman allegedly shows that Maj. Thumser's superiors were aware of his need for latitude in scheduling TDY travel, that Maj. Thumser did not mislead his superiors regarding the role of SATO in his travels, and that Maj. Thumser had no intention of violating Air Force TDY regulations.

The AFBCMR took this evidence into account, but it was not persuaded that LTC Hawley's decision to write the LOR was improper. On September 12, 2000, the AFBCMR ruled that Maj. Thumser had not demonstrated the existence of probable material error or injustice, and therefore rejected his final petition for reconsideration.

Maj. Thumser now petitions the court to overturn the decisions of the AFBCMR, and reinstate him to active duty at the rank of Major, with back pay and allowances and remand his case to the AFBCMR for promotion reconsideration for the rank of LTC.

## DISCUSSION

In its June 14, 1995, motion to dismiss (before the case was stayed) defendant asserted that the court did not have jurisdiction over Maj. Thumser's claim and, alternatively, that his claim was non-justiciable before proceeding to argue the merits. In its motion for judgment on the administrative record currently pending, defendant does not question jurisdiction or justiciability. Although

defendant appears to have dropped these arguments, because they implicate jurisdiction we will address them briefly.

Maj. Thumser's present claim is fundamentally a military pay claim. He was a member of the Air Force on active duty until his involuntary retirement. He claims that he was wrongfully discharged, and thereby deprived of pay and benefits to which he was entitled by law. One of the various forms of relief Maj. Thumser seeks is to be reinstated to active duty with back pay and allowances. This presents a money claim based on the Tucker Act, 28 U.S.C. § 1491 (2000), and 37 U.S.C. § 204 (2000), which, read together, give the court jurisdiction to review claims for back pay by service members on active duty. *See Palmer v. United States,* 168 F.3d 1310, 1314 (Fed.Cir.1999); *Sanders v. United States,* 219 Ct.Cl. 285, 297, 594 F.2d 804 (1979); *Holley v. United States,* 124 F.3d 1462, 1465 (Fed.Cir.1997). Maj. Thumser's claim, therefore, falls with the jurisdiction of this court.

Maj. Thumser's present claim is also justiciable. As we discuss below, the court exercises great deference to the military in reviewing personnel decisions. *See Sanders,* 219 Ct.Cl. at 302, 594 F.2d 804; *Orloff v. Willoughby,* 345 U.S. 83, 93–94, 73 S.Ct. 534, 97 L.Ed. 842 (1953). Nonetheless, the court has held that it is "charged with examining the record to ascertain if an officer has met his burden of showing that the challenged military action was arbitrary, capricious, unsupported by substantial evidence, or in violation of the law." *Richey v. United States,* 50 Fed.Cl. 3, 14 (quoting *Germano v. United States,* 26 Cl.Ct. 1446, 1459 (1992)). And the court has the power to review both the decisions of the Boards of Corrections such as the AFBCMR as well as actions of military officers such as Maj. Thumser's superiors. *Sanders,* 219 Ct.Cl. at 299, 594 F.2d 804 ("like the [B]oards [for Correction of Military Records], the Secretary [of a branch of the armed services] must not act in an arbitrary, capricious manner, unsupported by substantial evidence, or in violation of the law. Actions of both are subject to judicial reversal for violation of such standards.").

■ Although Maj. Thumser's claim is both justiciable and one over which the court has jurisdiction, the scope of the court's review over decisions by the AFBCMR is limited:

> Once a plaintiff has sought relief from the Correction Board, such plaintiff is bound by that board's determination unless he can meet the difficult standard of proof that the Correction Board's decision was illegal because it was arbitrary, or capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation or mandatory published procedure of a substantive nature by which plaintiff has been seriously prejudiced, and money is due.

*Sanders,* 219 Ct.Cl. at 298, 594 F.2d 804. This standard (known as the "substantial evidence" test, *see Heisig v. U.S.,* 719 F.2d 1153, 1156 (Fed.Cir.1983)) has been cited by both parties. Under this standard, in order to overturn a decision by the AFBCMR, a plaintiff must show by cogent and clearly convincing evidence (1) a material legal error or injustice in the Correction Boards' proceedings, and (2) an adequate nexus between the error or injustice and his selection for involuntary release from active duty. *Richey v. United States,* 50 Fed.Cl. 3, 13 (2001) (citing *Hary v. United States,* 618 F.2d 704, 706, 223 Ct.Cl. 10, 15 (1980)).

■ In order to justify overturning the AFBCMR's ruling, the evidence supporting Maj. Thumser's claim must "overcome the strong, but rebuttable, presumption that members of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." *Sanders,* 219 Ct.Cl. at 302, 594 F.2d 804. This is consistent with the general policy of the court to "allow the widest possible latitude to the armed services in their administration of personnel matters." *Id.* Similarly, it has been held that the "responsibility for determining who is fit or unfit to serve in the armed services is not a judicial province." *Heisig,* 719 F.2d at 1156 (citing *Orloff v. Willoughby,* 345 U.S. 83, 93–94, 73 S.Ct. 534, 97 L.Ed. 842 (1953)). Furthermore, the court has held that "while we may disagree with a correction board about whether or not a specific situation was un-

just, we will not substitute our judgment for the board's when reasonable minds could reach differing conclusions." *Sanders,* 219 Ct.Cl. at 302, 594 F.2d 804 (citing *Snell v. United States,* 168 Ct.Cl. 219, 227 (1964)). These precedents suggest the Maj. Thumser must overcome a considerable burden in order to justify overturning the AFBCMR decisions and reinstate him to active duty.

There is no evidence that the Air Force violated any procedures or due process, or that the AFBCMR did not have a complete or accurate record upon which to rule. Rather, Maj. Thumser disagrees with the AFBCMR's interpretation or treatment of the evidence. Under the substantial evidence test, in order to persuade the court to grant him relief by this rationale, Maj. Thumser must show that "evidence was ignored or unreasonably construed, or that designated duties were not performed by the AFBCMR." *Fluellen v. United States,* 44 Fed.Cl. 97, 101 (1999). Specifically, he alleges that the board erred by: (1) improperly referring to the Article 32 investigation to justify the LOR; (2) misinterpreting statements by LTC Moon regarding Maj. Thumser's assertion that SATO had routed him through Chicago; (3) failing to recognize Maj. Thumser's claim that he was granted route flexibility by his superiors; and (4) ignoring other exculpatory evidence.

The first accusation in Maj. Thumser's claim, that the AFBCMR improperly referred to the Article 32 investigation in order to justify the LOR, is an appropriate place to begin. The LOR is central to plaintiff's case. The UIF, the OPR and the subsequent pass overs all stemmed from the LOR. The AFBCMR's refusal to expunge the LOR from his record inevitably caused it to reject the rest of Maj. Thumser's pleas for relief. Therefore, the validity of the LOR and the AFBCMR's treatment of it are critical aspects of this case.

Maj. Thumser's argument fails, however. The AFBCMR did not simply assume that the LOR was justified because Maj. Thumser was subject to an investigation. On the contrary, it emphasized the differences between the allegations lodged by the investigation and those made in the LOR. While the investigation charged Maj. Thumser with suffering the loss of government currency, the LOR accuses him of routing TDY travel through Chicago for his own convenience even though he knew it was more expensive. While the investigation led to a charge of stealing government property (in then form of frequent flyer award certificates), the LOR only accused Maj. Thumser of failing to turn in the award certificates. These are different accusations. The AFBCMR's finding that the accusations in the LOR were supported by facts is credible. The record leaves little doubt that Maj. Thumser did indeed route himself through Chicago despite being aware that it was more expensive. And he did fail to return the award certificates to the Air Force.

The LOR is not a criminal charge and consequently is not subject to the rigorous burden of proof of a criminal trial. AFR 35–32, relied upon by the AFBCMR, states that LORs are "management tools, used by commanders ... to improve, correct and instruct subordinates who depart from standards of performance, conduct, bearing, behavior, integrity, etc." Unlike a criminal investigation, an LOR serves to educate rather than punish military personnel. In a similar case before the court, in which a plaintiff sought review of the AFBCMR's refusal to expunge his LOR, the plaintiff contended that his superiors were required to " 'substantiate' the charge against the plaintiff by documentary support before forwarding the reprimand for inclusion in the plaintiff's ... [f]ile." *Bowes v. United States,* 227 Ct.Cl. 166, 173, 645 F.2d 961 (1981). However, the court held that "[t]he nature of a letter of reprimand— an administrative censure of an officer for dereliction of duty—indicates that the additional requirements that the plaintiff would engraft onto the procedures specified in the regulation would be inappropriate and unnecessary." *Id.* at 173–74, 645 F.2d 961. Clearly a superior officer writing an LOR is not held to the exacting standards of a criminal investigation.[5] Considering this relatively

---

5. The AFBCMR included in its report the following excerpt from OpJAGAF 1979/29, 12 Apr. 79:

"Administrative actions do not need to be based on the 'beyond a reasonable doubt' burden of

low burden of proof and the factual support for the accusations made in the LOR, we certainly cannot say that the AFBCMR was "arbitrary or capricious" in ruling that the LOR against Maj. Thumser was justified.

The second basis for Maj. Thumser's claim is that the AFBCMR's rejection of his interpretation of LTC Moon's statements demonstrates its "arbitrary and capricious" decision-making. This assertion also fails. LTC Moon was interviewed on June 29, 1987, as part of the investigation of Maj. Thumser. The interviewer recorded that Maj. Thumser "advised him (Moon) something to the effect of: '[t]hat is the way SATO is routing me in some cases.'" On June 30, 1987, LTC Moon made a statement in writing that Maj. Thumser "told me that the SATO office purchased his tickets and routed him." Maj. Thumser claims that the interviewer's version of LTC Moon's statement disproves the allegation in the LOR accusing Maj. Thumser of falsely telling LTC Moon that SATO was routing him through Chicago, when in fact he was routing himself through Chicago.

First, there is no evidence to suggest that the interviewer's version of LTC Moon's comments is more accurate than his written statement. The court is not in the position to dictate to the AFBCMR which parts of the factual record are to be believed and which are to be discarded.

Furthermore, the interviewer's version, if it is assumed to be correct, does not discredit the LOR. The LOR states that "you [Maj. Thumser] told him [LTC Moon] that SATO was routing you through Chicago. The truth is that SATO was routing you through Chicago because you told them you had business in Chicago when you didn't on at least six of eight occasions." The foundation of this accusation is that Maj. Thumser led LTC Moon to believe that SATO was responsible for the Chicago routing, when in fact, Maj. Thumser was causing himself to be routed through Chicago under false pretenses. Both of LTC Moon's statements support this accusation. Both statements would give any reasonable person the impression that SATO, not Maj.

Thumser, was ultimately responsible for arranging the Chicago route. The record strongly suggests that this was not the case. For example, the Investigating Officer's Report states that "the testimony of Karen Tune, SATO employee, and SA Kiger establish this routing was ... frequently accomplished at the request of the accused." Further testimony by another SATO employee indicated that Maj. Thumser affirmatively requested the Chicago route for business reasons. LTC Moon, in his September 14, 1995 statement, also indicated that Maj. Thumser had control over his own travel plans: "It is not only ridiculous, but illogical to think that I or the command was unaware that Major Thumser was the one selecting certain flight times." Lastly, Maj. Thumser's continued arguments that he routed his trips through Chicago in order to spend more time with his wife suggest his own responsibility for the alternate routing. Therefore, either of LTC Moon's statements support the accusation in the LOR.

The third basis for Maj. Thumser's claim is that he was given route flexibility by his superiors. The statements of LTC Moon and LTC Hageman support this assertion to some degree. But this is no way diminishes the validity of the LOR. The LOR makes three accusations: Maj. Thumser routed his TDY travel through Chicago for his own convenience despite the knowledge that that route was more expensive; he misled LTC Moon and LTC Hawley regarding whether SATO or Maj. Thumser himself was responsible for selecting the Chicago route; he received and failed to turn in two airline award certificates. Being granted route flexibility by his superior officers in no way contradicts these allegations. As stated above, the LOR was the basis for the UIF, the OPR and the subsequent pass overs and the AFBCMR's refusal to expunge the LOR from his record, inevitably caused it to reject the rest of Maj. Thumser's pleas for relief. Therefore, whatever flexibility LTC Moon and LTC Hageman awarded Maj. Thumser does not help his present claim.

proof that is required for military justice actions. Administrative actions cannot be arbitrary, but this test is satisfied when the action is supported

by substantial evidence, or at most by a preponderance of the evidence."

Maj. Thumser's assertion that the alleged permission of his superiors "immunizes" him from TDY travel policy violations based on *United States v. Roberts,* 779 F.2d 565, 567–68 (9th Cir.1986) is misplaced. As discussed above, Maj. Thumser is no longer in the position of contesting criminal charges. The actions of his superiors may have "immunized" Maj. Thumser from criminal liability, but that does not affect the validity of the LOR and the AFBCMR's ruling in this proceeding.

The fourth and final basis for Maj. Thumser's claim is that the AFBCMR ignored exculpatory evidence. But there is nothing to suggest that the factual record that the AFBCMR had before it was incomplete or erroneous. Maj. Thumser only sets out a few facts that he believes work in his favor, but were not interpreted in a favorable manner by the AFBCMR. Such assertions are characteristic of Maj. Thumser's entire claim. The errors he charges to the AFBCMR are based on conflicting interpretations of the evidence, not procedural or legal errors.

Maj. Thumser does cite AFR 35–32 and 36–10 as "tests and standards" by which the court can decide this controversy under the substantial evidence standard. AFR 36–10 requires that unfavorable information, such as an LOR be "fair, accurate, unbiased evaluations ... ensure maximum objectivity in all referral OPRs, the rater's comments ... must be carefully considered ... [and may not be] inaccurate, unjust or unfairly prejudicial to [an officer's] career." AFR 35–32 requires that "[t]he [UIF] contains only verified and substantiated unfavorable information ... [and] if mitigating circumstances occurred." The only evidence Maj. Thumser can muster to suggest that these regulations have been violated, however, is his own subjective interpretation of the evidence, which obviously differs from that of the AFBCMR. In reality, Maj. Thumser is understandably disappointed with the path of his career and he seeks to have his interpretation of the facts imposed upon the Air Force chain of command that is charged with making such personnel and career decisions. This is precisely the type of intervention that the substantial evidence standard is meant to put

beyond the reach of the court. *Sanders,* 219 Ct.Cl. at 302, 594 F.2d 804. *See Zavislak v. United States,* 29 Fed.Cl. at 531. *See also Muse v. United States,* 13 Cl.Ct. 372, 377 (1987). The AFBCMR has not committed any legal or procedural errors and nothing in the factual record persuades us that its rulings were arbitrary or capricious. Therefore, the court will not overturn its decisions regarding Maj. Thumser's records.

### CONCLUSION

Defendant's motion for judgment on the administrative record is granted and plaintiff's motion for judgment on the administrative record is denied. Accordingly, the complaint is dismissed. The clerk shall enter judgment accordingly. No costs.